Davis, Judge,
delivered the opinion of the court:
This is a study in the toils of ambiguity. The parties put their names to a contract which, on the point crucial to this lawsuit, could reasonably be read in two conflicting fashions. Each signatory seized in its own mind upon a different one of these contradictory versions. Compounding that confusion, they discussed the issue with each other in such a way that each thought, but this time without good reason, it had obtained the other’s acquiescence in its chosen reading. The impasse became unmistakably plain when it was too late. Our task is to determine on whom should fall the risk of such mutually reinforced obscurity.
The Government set out to procure, through bids, a large number of complex generator sets — called the MD-3 set— used to calibrate the electronic systems of the B-47 and other aircraft and to start the engines when an electric starter is required. Beech Aircraft Corporation, which had previously made these elaborate devices for the Air Force on a negotiated basis, had prepared specifications and drawings of various of the component parts which the Government acquired and incorporated in the bid invitations. Plaintiff[1] was the low bidder, lower than Beech and another company which had also provided the sets under a negotiated contract. After a period of consideration and some discussion, *4 the award was made to plaintiff and it performed the contract as required by the Government.
The only dispute now before us is whether five components of these generator sets had to be manufactured by (or with the authorization of) certain named companies, as the Government urges, or whether plaintiff was entitled under the contract to furnish identical components made by other firms (presumably at lower prices). After the award, defendant insisted that the products of the specified companies had to be furnished. Plaintiff complied but, claiming that this directive constituted a contractual change, sought review by the Board of Contract Appeals under the Changes and Disputes articles. The Board turned down the appeal on the ground that plaintiff had been told before the award of the defendant’s position and had acquiesced.
For the five components now involved, the textual provisions of the specifications (borrowed from Beech) gave general descriptions, without naming any manufacturer; however, the drawings (also from Beech) listed the part numbers given to the item by a particular firm and declared that that manufacturer was the “approved source”, or that the component “may be purchased” from that company, or indicated “make from” a part furnished by a particular company, or simply said that the component was a certain part number of a specific firm. There are also other, slighter, indications of contractual meaning on which the parties rely; the details are set forth in the findings.
Each side urges that its position is sustained by the invitation as a whole — without any need to go beyond the bounds of the contractual instruments. The defendant stresses the references to specific part numbers, designated by particular fabricators, as necessarily showing that only parts made under the aegis of that manufacturer would be acceptable; this use of exact part numbers is said to be equivalent to a mandatory direction to incorporate only those very items. Defendant also points out that: (i) the drawings and specifications for the five components were not adequate for a new manufacturer to make those articles in the relatively short time allotted for completion of the procurement; (ii) the defendant was satisfied with components made from parts *5 supplied by the named manufacturers (because they had been fully tested in the past), but would be required before acceptance to test components made by others; and (iii) this burdensome and time-consuming testing would not be practicable within the scheduled period of delivery. It should have been clear, defendant concludes, that the contract called for items supplied by or through the specific companies named in the drawings. (Defendant’s witnesses testified to this effect before the Board and at the trial in this court.)
The plaintiff, on the other hand, emphasizes the lack of express mandatory language in the references to particular manufacturers for the five disputed components — in contrast to certain other components which the specifications very plainly declared “shall be” or “shall consist of” an identified part made by a named manufacturer. A command to use only materials or elements made by a specific firm is not frequent in government procurement; it can be expected to be phrased explicitly and not left to inference. Moreover, the references to particular part numbers are not read as mandatory because of a specification provision (labeled “Identification of Parts”) which stated:
Beech and vendor part numbers will be shown on all items except those items supplied by other than Beech Aircraft Corporation or vendors to Beech. On items supplied by other than present sources Beech part numbers will be used with a suffix to indicate a different supplier.
To plaintiff, this clause implicitly authorized the use of identical components made by other companies than those named in the Beech drawings. It thought that it could obtain such qualified substitutes by combining the knowledge gained from three sources: the drawings and specifications (insufficient though they .might be); a careful break-down of the sample models supplied plaintiff by the defendant; and general engineering cdmpetence. Plaintiff was satisfied that the proper components could be produced in this way within the time allowed. (The contractor’s position was likewise supported by evidence before the Board of Contract Appeals.)
This summary of the opposing contentions is enough to *6 show that no sure guide to the solution of the problem can be found within the four corners of the contractual documents. As with so many other agreements, there is something for each party and no ready answer can be drawn from the texts alone. Both plaintiff’s and defendant’s interpretations lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted- — unless the parties’ intention is otherwise affirmatively revealed. Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390, 418 (1947) ; First-Citizens Bank & Trust Co. v. United States, 110 Ct. Cl. 280, 310, 76 F. Supp. 250, 266 (1948); Western Contracting Corp. v. United States, 144 Ct. Cl. 318, 326 (1958); W. H. Edwards Eng’r. Corp. v. United States, 161 Ct. Cl. 322, 331-32 (1963) ; Freedman v. United States, 162 Ct. Cl. 390, 400, 320 F. 2d 359, 365 (1963). This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions (see Consolidated Eng'r. Co. v. United States, 98 Ct. Cl. 256, 280 (1943) ; Ring Constr. Corp. v. United States, 142 Ct. Cl. 731, 734, 162 F. Supp. 190, 192 (1958); Jefferson Constr. Co. v. United States, 151 Ct. Cl. 75, 89-91 (1960)), he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions — as well as the main risk of a failure to carry that responsibility. If the defendant chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts *7 and especially of the specifications.[2] Or it can shift the burden of ambiguity (to some extent) by inserting provisions in the contract clearly calling upon possible contractors aware of a problem-in-interpretation to seek an explanation before bidding. See Beacon Constr. Co. v. United States, 161 Ct. Cl. 1, 6-7, 314 F. 2d 501, 504 (1963); Guyler v. United States, 161 Ct. Cl. 159, 168, 314 F. 2d 506, 510-511 (1963) (concurring opinion).
If there were nothing more, the case would end here with a ruling for the plaintiff. But the defendant argues, and the Board of Contract Appeals found, that before the award was made or the contract signed the plaintiff learned the Government’s view of the disputed point and accepted that position.[3] The Board rested its decision on two meetings between the parties, after the bids but prior to the award. At the first (on December 19, 1956), the contractor’s only representative was Cecil Sugarman, its sales manager who had had no part in the preparation of the bid and had no actual authority to commit the plaintiff; on the basis of the evidence of the Government representatives (Sugarman did not testify at that stage) the Board found it had been made clear to the contractor that only components (including the five in question) from the named manufacturers would be acceptable and that the contractor so understood and agreed. The Board also relied somewhat on a later conference (January 3, 1957) at plaintiff’s plant at which defendant’s people met with Mr. Bohr, the vice-president concerned with this procurement, and a few others from plaintiff’s side.[4] If the Board’s determination that plaintiff was told of (and acquiesced in) defendant’s position is binding on or accepted by us, the tables would be turned. The initial ambiguity in the specifications would have been authoritatively resolved *8 before the contract was made; plaintiff would have voluntarily agreed, at a time when it could have (in effect) withdrawn its bid,[5] to the Government’s reading of the terms of the transaction.
There are a number of subsidiary questions, some harder than the rest, entangled in the issue of whether we should or must ratify the Board’s findings. The defendant now says that we are barred by United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963), from paying any attention to the additional evidence which was presented by both sides at the trial in this court and must confine ourselves to the record before the Board. But the defendant made no objection to the receipt of such de novo evidence, nor did it seek to raise or preserve this point until the oral argument. As we recently held in Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 806 (1963, in such a case the Bianchi issue has been waived. See, also, United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36-38 (1952); North American Airlines v. Civil Aeronautics Board, 240 F. 2d 867, 874 (C.A.D.C., 1956), cert. denied, 353 U.S. 941 (1957); Adams v. Witmer, 271 F. 2d 29, 36-37 (C.A. 9, 1958). We are therefore free to take account of the new evidence along with the old.[6]
Another question is whether an administrative determination o.f this character is entitled in court to any special weight under the Bianchi ruling and the Wunderlich Act, 41 U.S.C. §§ 321-322, even if reasonable and supported by substantial evidence. The holding that plaintiff acquiesced in the Government’s interpretation, though a “factual” finding in one sense, is intimately related to the legal question of what was the contract the parties made between themselves; under the Act, all legal questions are to be resolved independently by the court, and under our prior decisions subordinate “factual” findings akin to those made here are wholly subsumed in the larger legal problem of contract interpretation. See, also, Blake Construction Co. v. United States, 296 F. 2d 393, *9 396-397 (C.A.D.C., 1961). That is a problem which we shall doubtless have to meet again in other cases. For the present, we can pretermit it — as we did in Stein Bros. Mfg. Co. v. United States, supra, p. 806. On consideration of the record before the Board and in this court, we have concluded that, even if the Board’s findings are fully treated as factual, they are not final under the Act because they lack substantial support in the record as a whole.
At the trial in this court, Commissioner McConnaughey had the benefit, with respect to the pre-award meetings between the parties, of testimony by Sugarman (who did not appear before the Board) and of other representatives of both sides, as well as of certain documentary materials (notably an internal memorandum by a Government contracting official made after the December 19, 1956 meeting with Sugarman). He also had the evidence before the Board. The Commissioner concluded on the basis of the entire record that there was no substantial support for either of the Board’s double findings: (a) that at the December conference Sugarman acquiesced, actually or apparently, in the defendant’s interpretation of those provisions of the invitation that relate to the five components, or that defendant’s officials had reason to think he had so acquiesced; and (b) that this acquiescence was confirmed and reinforced at the meeting of January 3,1957. We agree with and adopt these conclusions of the Commissioner; the underlying facts are set forth in findings 16, 17, 18 and 25. Taking the two meetings together, it is plain that the defendant expressed a general view as to the source of components, but there is no adequate ground for deciding that plaintiff submitted or assented with regard to the five in dispute. The result is that, assuming it to be covered by the finality provision of the Wunderlich Act, the Board’s adverse decision is nevertheless deprived of finality for failure to comply with the statutory criteria.
Unconstrained by the administrative determination, we can make our own findings, from the whole record, on the issue of acceptance by one side of 'the other’s view. See United States v. Carlo Bianchi & Co., supra, 373 U.S. 709, *10 717.[7] Here, too, we agree with the Trial Commissioner that (i) both parties became aware of the other’s interpretation; (ii) neither acquiesced knowingly in the other’s interpretation; (iii) both thought, however, that the other had acquiesced; (iv) without either having reasonable grounds for so thinking; and, finally, that (v) neither took the proper steps to clarify the pertinent terms of the transaction until after the award was made. On both sides ambiguous utterance was piled on unwarranted assumption and laced together by unspoken premise. In the end, the Government officials thought they had made it quite clear that the named manufacturers would have to be used for all components, while the plaintiff’s people felt that they had successfully stood their ground at least as to these five components. Both were wholly wrong in their understanding of the other’s understanding. The discussions had been one prolonged minuet of cross-purposes.
In these circumstances should the onus of the original ambiguity in the specifications still rest on the defendant? We can see no other conclusion. As the author of the defect in the drafting which led plaintiff to the reasonable supposition that it could obtain the five components elsewhere than from the named companies, the Government was under the affirmative obligation (if it wished its own view to prevail) to clarify the meaning of the contract in definitive fashion before the plaintiff was bound. It did make such an attempt, and it did reveal its own view. But when the plaintiff demurred the Government did not adequately indicate that it stood steadfast by its announced opinion. There was a fatal insufficiency in the defendant’s effort to communicate to plaintiff that the contract was to be interpreted as the Government understood it. Largely because of this lapse, the plaintiff was left with the mistaken impression that the defendant, rather than insisting, would accept plaintiff’s rendering of the contract. The Government, in a word, was very lax in seeing the matter through. *11 Since the burden of clarification was the defendant’s, it must bear the risk of an insufficient attempt, even though the plaintiff’s obtuseness likewise contributed to the continuance of the misunderstanding. If there had been no communication by defendant to plaintiff between the receipt of the bids and the making of the award, the defendant would have had to suffer the consequences of its poorly drafted specifications. The ineffective attempt to put things right does not place the defendant in a better position. Only an adequate effort to reach the plaintiff’s mind could have that result.
Two objections may be made to our taking this ground. The inconclusive discussions between the parties show, it may be said, that there was no “meeting of the minds” on the issue which concerns us, and therefore no valid contract. There was no subjective coming-together, it is true, but an enforceable agreement came into being nevertheless. The design of the contract can be picked from the terms and words of the invitation, objectively read with the aid of rules of contract construction (which are distillates of the common experience and the common sense of justice). It is a normal characteristic of the class of cases in which the courts have held ambiguities against the drafter that the parties’ minds have failed to meet on the specific point in dispute. That gap has not been permitted to swallow the whole contract except perhaps where the gulf is far closer to the bounds of the entire consensual perimeter than here. For a contract to exist there does not have to be, and rarely is, a subjective “meeting of the minds” all along the line. See Corbin, Contracts, §§ 95, 106, 546, 559.
The other objection is that the plaintiff is bound by the opposing view of the contract because it twice extended the defendant’s time to make the award (on February 8 and 18, 1957) after the Air Force’s representatives had told plaintiff of their attitude. This contention must be rejected for the reason given above. Although it had the burden, the defendant simply did not make it clear enough that it stood by its position despite the plaintiff’s disagreement. When the latter extended the time for the award it did not comprehend that the Government was insisting on its own con *12 struction. This state of affairs was attributable, in substantial measure, to defects in the defendant’s course of communication to plaintiff on the subject of the source of the five components. Plaintiff was also at fault, but the risk of a failure to clarify lay largely upon the Government and could have been averted only by a more sufficient effort than was made.
We hold, therefore, that the defendant was wrong in demanding that only products of (or authorized by) the named manufacturers could be used for the five components. The contract did not so require. The issue of the amount of damages or recovery has not been tried and we are not called upon to pass upon any aspects of that question. We leave all such problems to the trial under Eule 38(c), including the issue of which party has the burden of showing that the components plaintiff planned to use would or would not have been available, and would or would not have qualified under this contract.
The plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Eule 38(c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follow:
1. The plaintiff is a New York corporation.
2. The petition alleges that, in January 1959, the plaintiff acquired all the assets of another corporation, International Fermont Machinery Co. Inc. (hereafter sometimes referred to as “Fermont”), including whatever rights Fermont (which was then dissolved) had under the contract that is the subject of this action.[8]
The only proof in the record concerning these allegations (which are denied in the answer for lack of knowledge) is *13 an affidavit by the plaintiff’s secretary, dated January 6, I960,[9] attached to plaintiff’s reply to defendant’s opposition to plaintiff’s motion for summary judgment. The court denied the motion. The record contains no evidence that contradicts the statements made in the affidavit and defendant has not suggested that it has any basis for controverting them.
3. This case relates to the interpretation of a contract, satisfactorily performed, under which the plaintiff manufactured and supplied to the defendant, electric generator sets of a type designated MD-3, used to calibrate the electronic bombing, navigation, and gunnery systems of the B-47 and other aircraft, and to start the engines of such aircraft where an electric starter is required.
The defendant’s procurement representatives insisted that, as to five components of the generator sets, identified in certain drawings, incorporated by reference in Invitation for Bids No. 33-600-57-55 (referred to hereafter as “the invitation”) , which was issued by the defendant November 13, 1953, the contract required the plaintiff to furnish components made by manufacturers named in those drawings. The plaintiff claims that, under the terms of the contract, it was entitled to furnish identical components made by other manufacturers, which it says it could have procured at substantially lower prices.
The plaintiff ultimately furnished the components insisted upon by the defendant’s representatives and now seeks to recover (1) the difference between the cost of the components the defendant required it to furnish and the allegedly lower cost of components from alternative sources which plaintiff *14 says it was entitled to furnish,[10] and (2) the amount of a claim, asserted against the plaintiff 'by Bogue Electric Manufacturing 'Company, a potential alternative source of two of the five components, based on plaintiff’s cancellation of purchase orders for such components when it learned that it would not be permitted to furnish components from alternative sources.[11]
The validity of the basis for the amounts claimed can be determined more readily through proceedings under Rule 38(c), after the court has first determined whether the defendant is liable, than it can at this stage of the case, on the record as it now stands.
4. On November 13, 1956, the defendant, acting through Wright-Patterson Air Force Base procurement officials, issued the invitation for the manufacture and supply of two pilot models and a substantial production quantity (900 to 1,825) of Engine-Generator Sets, Type MD-3,[12] together with a large quantity of spare parts to support the complete sets.[13]
5. In making up the invitation, the defendant’s procurement officials used specifications and drawings that Beech Aircraft Corporation had prepared for its own use in connection with its previous manufacture of the MD-3 generator sets. The defendant had acquired title to these drawings. The five components involved in this suit were described generally in the textual provisions of the specifications, but *15 the manufacturers whose parts defendant ultimately ordered plaintiff to use were not named in those textual provisions. For some other components, sole sources were prescribed in the text. The sole identification, in the invitation, of manufacturers for the five components consisted of certain of the Beech drawings and legends, notes, and lists contained in the drawings.
6. (a) The five components in question, the drawing numbers on which the legends appear, the text of the legends themselves, and the parts numbers are as follows:
(i) Frequency Meter and Indicator, Beech Aircraft Drawing Ho. 293-2000 (listed as Part Ho. 6500) :
MAY BE PURCHASED FROM VARO MFG. CO., IHC., GARLAHD, TEXAS, and
COHSISTS OF: 1 REQ’D OF 6500-1 FRE-QUEHCYIHDICATOR & 1 REQ’D OF 6500-2 FRE-QUEHCY TRAHSMITTER
(ii) Front Drive Motor, Beech Aircraft Drawing Ho. 231-0001 (listed as Part Ho. 5BC21MJ85A):
APPROVED SOURCE 5BC21MJ85A MOTOR ASSY PART HO. GEHERAL ELECTRIC CO. SCHEHECTADY, H.Y.
(iii) Current Control Unit, Beech Aircraft Drawing Ho. 293-2000 (listed as Part Ho. 54E112-1) :
MAY BE PURCHASED FROM RAM METER IHC. FERHDALE, MICHIGAH
(iv) Blower Fan, Beech Aircraft Drawing Ho. 235-1012 (listed as Part Ho. AVR90-65D638 X702-74B):
MAKE FROM JOY MFG. CO. HEW PHILADELPHIA OHIO MODEL AVR 90-65D638 (DWG. X702-74B WITH IHLET BELL) FAH
(v) Regulator Control Shunt, Beech Drawing Ho. 293-3107 (listed as Part Ho. 50K3^4) :
50K3-4 SHUHT-REG. COHT. PART HO. OF RAM METER CORP. FERHDALE, MICH.
(b) The invitation also contained the following provision under the heading “Identification of Parts”:
Beech and vendor part numbers will be shown on all items except those items supplied by other than Beech Aircraft Corporation or vendors to Beech. On items supplied by other than present sources Beech part numbers will be used with a suffix to indicate a different supplier.
The plaintiff regarded this provision (along with other *16 evidence in the invitation, such as the apparent absence of mandatory language in the legends that identified the parts (see also findings 5 and 9)) as indicating an expressed intention to accord to the contractor an option to furnish components made by suppliers other than those identified in the invitation in conjunction with the part numbers. Defendant’s witnesses testified that in their view the listing of the specific parts numbers required the contractor to obtain the components of the company so designating its items, and the “Identification of Parts” provision did not authorize the substitution of similar or identical components made by others.
7. (a) In the aggregate, the invitation included over 1,800 square feet of drawings and upwards of a thousand specifications. Hot all the drawings are in the record. Those that relate to the five components here in question are.
They contained lists of materials which designated the components 'by parts numbers and the names of manufacturers and indicated the quantity of each part required for each set. The drawings illustrated the components adequately to identify them and to show their form and overall dimensions, and, in a more or less general way, their construction. They were not adequately detailed, however, to serve, alone, as working drawings for making any of the five components. In addition to referring to the material that composed the invitation, anyone attempting to make any of the five components probably would have had to utilize, as models, parts from at least one of the sample models furnished by the defendant to the plaintiff.[14] Even these would not indicate the tolerances requisite for an acceptable product, which neither the drawings nor the specifications showed.
There is evidence that the plaintiff’s engineers, and those of companies from which plaintiff proposed to procure some of these components, were satisfied that, by using the drawings and parts of the sample models, applying available engineering competence, experience, and know how, and using recognized engineering handbooks to fix tolerances, they *17 could hare made components that would have fully met the requirements. Defendant’s witnesses testified that it would not be practicable for other manufacturers to make qualified components and to have them tested within the time allowed for this procurement.
However that may be, it is clear that the material which composed or accompanied the invitation was not well adapted to facilitate the making of these five components by manufacturers other than those named. The latter presumably either had them in stock or had established facilities for making them and specific experience in doing so.
(b) These facts are not conclusive evidence that, as to the source of these five components, the invitation, read as a whole, was mandatory, but they do have some tendency to suggest an expectation, if not an intention to require that the components furnished by the contractor would be made by the manufacturers named.
8. (a) The generator sets to be furnished in response to the invitation were urgently needed. Before issuing the invitation, the defendant’s procurement officials reviewed the Beech specification and deleted the words “or equal” and “or equivalent” wherever they appeared (with one exception, not directly relevant here, which they overlooked). Their subjective intention in making these deletions was to eliminate a conventional affirmative indication that the contractor had an option to utilize components different from those identified in the specifications and related documents. Their subjective purpose in doing so was to require that the generator sets would be composed of parts, made by the manufacturers named, which already had been tested and were known to be capable of performing the complicated functions of the generator set satisfactorily. Through such requirements they intended to forestall such delays as might result from additional testing of either components from sources other than those already proved satisfactory or generator sets containing components from such alternative sources.
(b) The fact that the invitation contained one item with respect to which the defendant expressly specified (even though inadvertently) that an equivalent component could be used might be regarded as affording some evidence to a *18 prospective contractor that, where components from alternative sources were deemed acceptable, the option to furnish components from such sources would be indicated by some such statement as “or equal” or “or equivalent.” In these circumstances, the absence of any such statement in connection with the identification of any of the five components in question here might suggest to a careful bidder the possibility that, despite the lack of clear mandatory language in the legends identifying the components, no option was intended. There were, however, counterbalancing factors, as indicated in findings 5, 6, and 9.
9. (a) In contrast to the absence of clear mandatory language specifically directing that the five components in question here be procured from the sources named in the legends that identify them, certain other components of the generator sets, not directly involved here, were subject to clearly mandatory directions in the specifications that the component “shall be” or “shall consist of” an identified part made by a named manufacturer.
(b) The presence in the invitation of unequivocally mandatory directions to procure other parts from named sources affords some basis for an inference by a bidder that, in respect of components, such as the five in question here, that were not subject to such affirmatively mandatory directions, the bidder might have the option to procure such components from alternative sources of its own choice.
10. (a) In the aggregate, the internal evidence disclosed by the terms of the invitation itself affords no adequate basis for finding as a fact that, as to the five components in question here, the invitation expressed, clearly and unequivocally, either an intention that the contractor must furnish parts made by the manufacturers named in identifying the parts or an intention that identical parts made by some other manufacturer of the contractor’s choice would be acceptable.
(b) Various engineers testified before the Board concerning their reading of the language used in the invitation. This testimony fell along purely partisan lines. Except for a few minor concessions, the Government procurement officials were quite positive that the language of the invitation, as they read it, plainly required the contractor to furnish *19 components made by the manufacturers named in identifying the parts. The engineers who represented the plaintiff and its potential alternative suppliers were equally positive in their contrary convictions.
The net effect of this evidence appears to be that, to persons who had attended any of several reputable engineering schools, had worked under distinguished engineers in certain companies, and had subsequently spent a considerable period of time drafting or administering contracts on behalf of the Government, the words used in the invitation expressed the intention for which the defendant contends here and which those who drafted the invitation intended to express, whereas to engineers whose basic training had come from other reputable institutions of learning and whose principal experience had been in negotiating and administering contracts on behalf of the plaintiff and others who supply the Government with manufactured products, the meaning of the words was equally clearly that for which the plaintiff contends.
(c) The intricate verbal analyses and the careful balancing and evaluation of vague and conflicting inferences and innuendoes that these witnesses engaged in to support their positive, but contrary, conclusions, and that are necessary to enable a disinterested person, lacking the specialized training and experience of either group, to arrive, even tentatively, at either conclusion, have the inevitable effect of suggesting that the significant language of the invitation is ambiguous enough to justify consideration of extraneous evidence that might contribute to an understanding of what the parties intended and understood the words to mean when the contract was perfected. That is what the Board did in the decision here under review. The following findings relate to such extraneous evidence.
11. Due to some error in handling by the defendant, no copy of the invitation was mailed to the plaintiff on the original mailing date. On November 28, 1956, after learning, through receipt of an amendment, that an invitation had been issued, the plaintiff, through its sales manager, Mr. Cecil Sugarman, informed the defendant’s representatives, both by telephone and by telegram, that it had not yet received a copy of the invitation and requested one. A copy was sent that day.
*20 12. On November 27, 1956, the day before a copy of the invitation was mailed to the plaintiff, the defendant held a preaward conference for prospective bidders on the invitation. The plaintiff did not know of the conference, did not attend, and consequently failed to receive certain advice pertinent to the procurement that was given by the defendant’s representatives to those present at the conference.
13. On December 10,1956, the defendant opened the bids submitted pursuant to the invitation. The plaintiff was low bidder by approximately $700,000. This was a $16,500,000" procurement, calling for 1,805 generator sets and two pilot models. The bid of Beech (which had previously supplied the item under a negotiated contract) was some $1,900,000, higher than plaintiff’s.
14. On December 12, 1956, the defendant, by telegram, requested the plaintiff to confirm its bid. The telegram pointed out several discrepancies which appeared to the defendant’s procurement officials to be obvious errors, as well as a discrepancy of $55,152, caused by erroneous extensions of unit prices for spare parts. This telegram invited the plaintiff “to this Headquarters to further discuss this matter.”
The reasons for the telegram were further explained to the plaintiff’s vice president, in a telephone call he (not Sugarman) made to Mr. Minch, a buyer who worked under Mr. Powell, the contracting officer.
15. On December 13, 1956, the plaintiff confirmed its bid to the defendant, by a telegram bearing the signature of Mr. Rohr, its vice president, and stated that, in the case of erroneous extensions, unit prices would govern. Thereafter, the plaintiff’s bid on the spare parts apparently was revised by $55,152.
16. (a) On December 19, 1956, Sugarman called personally at Wright Field.
According to Sugarman’s testimony (given in this court but not before the Board) which agreed generally with Rohr’s testimony before the Board, Sugarman’s usual responsibilities and activities were concerned mostly with commercial sales. He assisted in military sales, only as directed, and had no general responsibility or authority with *21 respect to the generator set contract; he had had no part in the preparation of plaintiff’s bid. He was in Ohio on other company business. He knew that the plaintiff had a contract under consideration at Wright Field and stopped by on December 19, as a matter of courtesy, and to see what information he could obtain concerning it.
Defendant’s representatives testified, however, that they somehow got the impression, which Sugarman failed to dispel, that he was president of the plaintiff.
Following a period of general conversational amenities, Sugarman discussed the invitation and plaintiff’s bid with Powell, the contracting officer, Minch, and Powell’s superior, Mills, who also had later conversations about the bid with Kohr, which are described hereafter.
(b) It seems clear, both from Sugarman’s testimony, and from the evidence given by defendant’s representatives, including a substantially contemporaneous memorandum, prepared by Powell, describing the meeting, that none of the five components concerned in this action was specifically discussed with Sugarman on December 19, 1956, and that the question whether any of these particular components would be acceptable if they were procured from sources other than the manufacturers mentioned in the invitation was not raised or considered.
Apparently the conversation about the bid related primarily, if not entirely, to the spare parts. It included some discussion as to whether it would be acceptable for the plaintiff to substitute “qualified components other than those stipulated in the drawings and specifications,” and Sugar-man was told that such substitutions would not be acceptable. “Qualified components” appears to have been recognized by all concerned as referring to parts on a “QPL” or “qualified products list,” which did not include any of the five components involved in this action.
There was also some general discussion of “logistic” problems that might be created if spare parts, other than those identified in the invitation, were furnished, and there is some evidence that Sugarman was informed, in a general way, of the defendant’s purpose to procure generator sets of tested design throughout in order to minimize the extensive testing *22 that might be required if sets including other components were furnished.
There is no evidence, though, that Sugarman asked specifically whether the plaintiff could furnish any of the five components in question here from sources other than the manufacturers identified in the invitation or that he was informed that that could not be done. There is evidence that he did make such an inquiry and received such advice concerning items on the Government’s “qualified products list” and there is evidence that, in response to this, he made some general statement to the effect that the plaintiff would plan on using “specified” components.
(c) The decision of the Board of Contract Appeals rests heavily upon this December 19 conversation with Sugarman as evidence that the plaintiff was informed of the defendant’s views concerning the meaning of the invitation as it affected the five components in question and apparently acquiesced in the defendant’s interpretation.
(d) The evidence as a whole, especially as supplemented by Sugarman’s testimony in this court, which was not before the Board, affords no substantial support to either of these conclusions. There is some basis for an inference that Sugar-man let it appear that he had more authority than he had with regard to this contract, but there is no credible evidence that any of the five components in question here was discussed, that Sugarman inquired, or that the defendant’s representatives made any representations to him, concerning their views about the sources from which any of these five components might be procured, or that Sugarman made any statement to defendant’s representatives that they were reasonably justified in considering as a specific representation of the course the plaintiff would follow in procuring these particular components.
(e) It does appear that the defendant’s representatives received, from this conversation with Sugarman, a general impression that, if the plaintiff should be awarded the contract, it proposed to conform with the specifications and there is some basis for inference that (if they gave the matter of these five components any thought whatever in connection with Sugarman’s visit, which seems highly doubtful), they merely *23 translated their subjective knowledge of what they themselves intended by the terms of the invitation, and their unwarranted misimpression that Sugarman was plaintiff’s president (which they made no effort to verify or correct) into a conclusion that the plaintiff’s principal executive officer had implied that the plaintiff shared their interpretation of the provisions relating to the five components in question here, and, accordingly, would furnish components made by the manufacturers mentioned in the invitation, even though Sugarman had not said so specifically and, indeed, even though the subject had not been discussed.
It seems clear from the evidence that Sugarman had no intention of expressing or implying any such commitment, had no authority to do so and had no idea that he had done so, and never indicated to other officials of the plaintiff that he had done so.
It seems equally clear that nothing he said or did at the December 19, 1956, conference gave defendant’s representatives any reasonable basis for a firm conclusion that he had made any such commitment.
(f) For the reasons stated in the foregoing findings, it is impossible to find substantial support in the evidence for a conclusion that, by virtue of anything Sugarman said or did on December 19, 1956, the plaintiff acquiesced, actually or apparently, in the defendant’s interpretation of those provisions of the invitation that relate to the five components in question here. Sugarman said nothing and did nothing knowingly that had any direct relation to any question concerning the source of the five components. Whatever impressions defendant’s representatives may have gathered by vague inference and unilateral deduction had no substantial basis in his actions and were readily susceptible to correction had they taken any reasonable steps to verify them.
(g) Moreover, the conversations of December 19, 1956, were neither the last word nor the most significant interchange between plaintiff’s and defendant’s representatives concerning the interpretation of the provisions of the invitation with regard to these five components. Subsequent conversations, before the award of the contract to the plaintiff, dealt directly with the question whether it would be *24 agreeable to tbe defendant for the plaintiff to furnish such components from sources other than those named in the drawings.
17. About December 21, 1956, the contracting officer wired the plaintiff requesting that it concur in the inclusion of a clause in the contract relative to disposition of property-made obsolete or excess by changes. Plaintiff’s reply, authorizing the inclusion, was made in ’Sugarman’s name.
The only significance of this incident is that it may have fortified the impression of defendant’s representatives that Sugarman had corporate authority to act with respect to the negotiation of the contract.
Considering all the evidence, it appears that 'Sugarman created a sufficiently persuasive appearance of authority to act with respect to the contract that, if he had said anything or done anything that reasonably might have been regarded as firmly and specifically committing the plaintiff to defendant’s interpretation of the provisions of the invitation relating to the source of the five components in question here, the plaintiff would have been bound by his action. But the record fails to show that he said anything or did anything that reasonably could have been regarded as creating such a commitment.
18. (a) On January 3, 1957, more than 2 weeks after Sugarman’s visit to Wright Field, a facility capability survey team, composed of defendant’s representatives, visited the plaintiff’s plant for the purpose of ascertaining the plaintiff’s ability to perform the contract. Mills appears to have been the most active and articulate among the defendant’s representatives on the capability survey team. Plaintiff was represented primarily by its vice president, Rohr, who had prepared the bid and had principal responsibility for negotiation of the contract. Sugarman appeared, from time to time, in the course of the discussions but apparently his participation was casual and incidental.
(b) One of the questions Mills wanted to clear up on this visit was where the plaintiff proposed to get the components it would use if it were awarded the contract. Obviously the defendant’s representatives did not consider that question settled by Sugarman’s previous visit.
*25 Accordingly, on January 3,1957, Mills asked if the plaintiff had a list of its proposed vendors, delivery schedules, and prices. In response, Eohr delivered to Mills a 3-page document, headed “MD-3 PAETS ESTIMATE,” which included the following statements concerning the five components involved in this case:

The asterisk after “POSSIBLE VEEDOES” refers to a footnote, which reads as follows:
*Where a specific part number is shown, it applies to one of the mentioned vendors. However, it is possible that the product of another vendor may be used which is identical and completely interchangeable in accordance with paragraph 3.7 of Beech Specification 231. In this case the part number may remain the same or be modified as the Air Forces require.
Paragraph 3.7 of Beech Specification 231 provides as follows:
Interchangeability. — All parts, except detail parts of assemblies which are riveted, welded, soldered or brazed together, having the same manufacturer’s part number shall be directly and completely interchangeable with each other with respect to installation and performance. Changes in the Contractor’s part numbers shall be governed by the drawing number requirements of Military Specification MIL-D-5028, Amendment 1.
(c) Not only was the MD-3 PAETS ESTIMATE furnished to the defendant during the visit of the capability survey team, but Mills and Eohr specifically discussed the question whether parts from sources other than the manufacturers named in the invitation could be furnished. Mills made it clear that, according to defendant’s interpretation of the invitation, parts from sources other than manufacturers named in the invitation could not be accepted. Eohr, on the *26 other hand, maintained that legally, under the terms of the invitation, they could, and that, according to his interpretation of the invitation, the defendant could not legally require components made by the named manufacturers.[15]
In addition to giving Mills the MD-3 PARTS ESTIMATE, Rohr stated, either to Mills or to some other member of the capability survey team, that if the defendant persisted in Mills’ view that only components from sources specifically mentioned in the invitation would be acceptable, that position should be stated in writing before the award.
It appears also, however, that Rohr made some statement, in the course of his discussion with Mills, to the effect that the plaintiff would comply with the specifications. Rohr’s subsequent actions and those of Mills indicate that what Rohr meant by this was that he proposed to follow his own interpretation of the specifications, whereas Mills thought Rohr was acquiescing in Mills’ interpretation.
(d) The situation after the interchange between Mills and Rohr, on January 3, as it appears from all the evidence, was that Mills had plainly stated, and Rohr understood, that it was defendant’s interpretation that components from sources other than those named in the invitation would not be acceptable, whereas Rohr’s list plainly indicated plaintiff’s contrary view that legally the invitation, by its terms, permitted the plaintiff to furnish parts from sources other than those named, and the list, together with Rohr’s comments, afforded a reasonable basis for defendant’s representatives at least to suspect, if not definitely to anticipate, that, as a practical matter, the plaintiff was planning to furnish parts from alternative sources unless it received more definite instructions to the contrary than it then had.
*27 It further appears, however, that Rohr’s comment that plaintiff would comply with the specifications, and Mills’ delusive conviction that the actually intended meaning of the terms of the invitation was as clear to others as it was to him, together with his knowledge of the difficulties of meeting the short deadline using components from any but the named sources, combined to give Mills the erroneous impression that Rohr intended to comply with Mills’ view of what the specifications meant, whereas what Rohr actually meant to indicate was that he would follow his own interpretation of the legal effect of the specifications unless he was told, in writing, to do otherwise.
(e) The actions of the plaintiff and the defendant, following the January conversations, tend to confirm the conclusions stated in finding 18(d).
Mills paid no further attention to the parts list Rohr had submitted. After the January 8 discussions, plaintiff received no communication (written or oral) from the defendant to the effect that plaintiff’s interpretation of the contract requirements, as indicated by its parts estimate submitted to Mills, was unacceptable. Both Mills and Powell testified that they did not believe any further action was necessary.
Rohr, on the other hand, in the absence of any word from the defendant, made no further inquiry about the matter but proceeded with arrangements to procure the parts from sources other than those named, obviously under the impression that he was legally entitled to do so, and that the defendant, by its silence, had tacitly acquiesced in his interpretation.
19. On February 8 and 18, 1957, plaintiff extended the time within which the defendant might accept its bid until March 11, 1957. On March 15, 1957, the plaintiff received timely notice of the award made on March 11,1957.
20. Promptly thereafter, plaintiff proceeded with its plans to procure the five components from sources other than the manufacturers named in the invitation.
21. On April 16, 1957, a conference was held at Wright Field at which defendant’s representatives orally instructed the plaintiff to furnish these five components from sources named in the legends on the drawings.
*28 22. Plaintiff promptly expressed its disagreement with these instructions, in a letter dated April 17, 1957, which contains the following statement:
;Js sH # Hí #
The following statement was expressed as being Air Force policy to be followed on subject contract and International Fermont Machinery Co., Inc. is in complete disagreement with it:
1) When there is a part which is not built to any specification, Qualified Product List or AN listing and there isn’t sufficient detail on the drawings to build the item from the drawings (usually only the manufacturers’ name and part number appear) this part must be bought from the manufacturer listed on the drawings. As mentioned above, International Fermont is in complete disagreement with this last statement of policy. As mentioned during the conference by Mr. D. Eohr of International Fermont, the Front Drive Motor and the Blower Fan fall in this last category. Orders have been placed with Bogue Manufacturing Co., to produce these two items which on the drawings are listed as Joy Manufacturing Co., and General Electric Co., parts. It is the contention of International Fermont that despite the fact that the drawings do not give sufficient detail to produce the two parts in question, the MDS unit, government furnished, is by contract, intended as a guide and model and any significant details of construction or performance may be obtained from the model itself without too much difficulty. This is exactly the way the necessary data and details were compiled which permitted International Fermont to place an order with a manufacturer other than the specified ones, Joy Manufacturing Co., and General Electric Co., and also the duplication of the performance and details of construction which will use the MD3 furnished as a model and guide will insure that the parts ordered from Bogue will perform at least as well as the Joy and G.E. units presently used.
* * * * *
23. On May 1, 1957, and May 7, 1957, the plaintiff was told, in writing, of the defendant’s disapproval of the sources from which the plaintiff planned to procure each of the five components, was told that, if it obtained such components from sources other than those specifically named in the invitation, the generator sets would be rejected for noncom *29 pliance with contract specifications even if the components supplied were identical with those made by the named sources, and was told that the only procedure through which components from other sources would be approved was by submission of engineering change proposals leading to authorization under the “CHANGES” clause of the contract, after presentation of satisfactory evidence that the components from the proposed sources complied fully with the contract specifications.[16]
24. The delivery schedule for the two pilot models that plaintiff was to supply foreclosed any possibility of obtaining timely authorization to furnish components from alternative sources under the “CHANGES” clause of the contract. Accordingly, following receipt of the letters of May 1 and May 7, 1957, the plaintiff terminated its arrangements with alternative suppliers, procured the five components from the sources named in the legends on the drawings and ultimately completed performance of the contract.
25. (a) The evidence fails to support a conclusion that either the plaintiff or the defendant knowingly acquiesced in the other’s interpretation of those terms of the invitation that relate to the sources from which the five components here in question were to be procured.
(b) The evidence fails to support a conclusion that the representatives of either party acted in such a way as reasonably to justify the representatives of the other in definitely concluding, without further inquiry, that acquiescence in their interpretation had occurred.
To the extent that the decision of the Board rests upon a determination that the plaintiff apparently acquiesced in the defendant’s interpretation of the invitation, the decision is not supported by substantial evidence.
(c) The representatives of each of the parties believed, subjectively, but without reasonable justification, that the other had acquiesced in its interpretation. As a consequence, when the award was made, there was no subjective meeting of the minds of the parties on the meaning intended to be expressed by those provisions of the contract that relate to *30 the sources from, which the five components here in question were to be procured.
(d) The vague and insubstantial grounds that existed for the belief or assumption by each party that the other had accepted and acquiesced in its interpretation were not sufficient to afford a clear justification for the failure of the representatives of either party to attempt, during the period between January 3,1957, and March 15,1957, to verify conclusively the terms on which they were doing business.
APPENDIX A
MCMPG May 1,1957.
SUBJECT: Contract AF 33 (600)-34428
THRU: Chief
New York Air Procurement District
ATTN: MAHYCC, Mr. Keiner
111 East 16th Street
New York 3, New York
TO: International Fermont Machinery Co.
Ramapo, New York
1. Reference is made to your letter of 17 April 1957 addressed to the New York Air Procurement District and the conference held at this Headquarters on 16 April 1957 at which Mr. Rohr of your company and numerous Air Force personnel were present.
2. A portion of the conference was devoted to a discussion of the contract requirements with respect to the manufacture and/or purchase of component parts of the MD-3 Generator Sets to be furnished under the contract. The contract requires that the MD-3 Generator Sets be in accordance with Beech Model Specification 231 revised 2 June 1956 (as amended by Exhibit “A” to the IFB) and Beech Drawing No. 293-0000 and details thereto. Mr. Rohr was advised during the conference that the contract requirements regarding the manufacture and/or purchase of component parts were as follows:
(a) When parts are listed on the drawings as AN Parts, or a part built to a specification which invokes a qualified products list, such parts may be purchased from any qualified vendor or made by the contractor if it is a qualified manufacturer.
(b) When parts are delineated with sufficient detail in the drawings, the parts may be produced by any responsible manufacturer.
(c) When parts are listed on the drawings by vendor’s name and part number only and the words “or equal” or the *31 words “or equivalent” do not appear either in the drawings or Beech Model Specification 231, the parts of the vendor shown on the drawings are to be furnished. Such parts may be procured from the manufacturer, any licensee manufacturer, or any distributor or dealer.
3. You have indicated agreement, both at the conference and in your letter, with the first and second statements of requirements in paragraph 2 above. You have, however, indicated disagreement with the third statement in paragraph 2 above; therefore, the remainder of this letter relates to the third statement of contract requirements.
4. You have stated in your letter that the parts in question (those listed on the drawings by manufacturer’s name and §art number only) are not built to any specifications. The overnment does not concur in this statement. Specifications in the form of drawings and manufacturing information are in existence; however, they are in the possession of the original manufacturer of the parts and are not available to the Government.
5. You also state in your letter that any significant details of construction or performance needed by a manufacturer to manufacture the parts in question (for example the Joy Fan Assembly and Front Wheel Drive Motor) can be obtained without too much difficulty from the MD-3 Generator Set furnished to you as “Government-Furnished Property”. The Government does not concur in this statement. Tolerances, manufacturing processes and assembly techniques, which cannot be obtained from the MD-3 Generator Set, are essential for the manufacture of parts which will operate under all of the conditions in the specification requirements.
6. With the exception of Eclipse Pioneer Part Number 40E17-1-A (referred to in paragraph 3.6.3.2 of Beech Specification 231) all references to “or equal” or “or equivalent” parts were omitted from the drawings and the specification for the specific reasons (i) that no equal or equivalent parts were known to be in existence which would meet the contract requirements and (ii) that when parts were listed on the drawings and in the specification by manufacturer’s name and part number, only the parts of that manufacturer were to be furnished under the contract.
7. The omission of the words “or equal” and/or “or equivalent” from the portion of specifications and drawings applicable to the parts in question creates a requirement for furnishing parts of the designated manufacturers or vendors. This requirement was specifically brought to your attention prior to contract award by Mr. Mills of AMC and Mr. Maple of WADO on their visit of 3 January 1957 to your plant and again during the conference of 16 April 1957 at this *32 Headquarters. The reasons for this requirement have also been brought to your attention before. The parts have undergone substantial qualification testing over a long period of time to determine their performance acceptability for use in the MD-3 Generator Set. The Government has incurred substantial costs in qualification tests and the use of substitute parts would necessitate additional costly and time consuming repetitive testing. The Government had at the time of award, and stiH has, an urgent need for the MD-3 Generator Sets to be furnished under the contract. The requirement for use of qualified parts was necessary to enable the Government to secure competition and to permit firms, such as your own, to meet the Government delivery requirements. Bidders were advised during the bidder’s conference that the required delivery schedule did not allow sufficient time for the qualification of untested parts. The testing required by paragraph 8(b) of the Invitation for Bid portion of the contract was reduced to the minimum for the reason that qualified parts were to be used. Attempts to qualify substitute parts would of necessity delay delivery. The Government has a substantial investment in engineering data and technical publications (operation and service instructions, overhaul instructions, and illustrated parts breakdown) which have been published throughout the Air Force System. [Revisions to such engineering data and technical publications were not procured under the contract for the reason that substitution of parts is not permitted. Any changes in, or substitution of, parts would require changes in engineering data and technical publications with additional expense to the Government. Some of the parts listed on the drawings by manufacturer’s name and part number only are required to be furnished under Item 4 as spare parts. Any substitution of parts would result in duplication of parts in Air Force inventories. Should you elect to propose deviations to the contract specification and drawing requirement of the contract with respect to parts listed by manufacturer’s or vendor’s name and part number only, such proposal should be in the form of an Engineering Change Proposal under the contract. In the event such proposal is favorably considered, approval of the change would be authorized by the Government pursuant to the “Changes” clause of the contract upon receipt of satisfactory evidence that the parts to be furnished are in full compliance with the contract specification. [Responsibility will rest squarely upon you to demonstrate by satisfactory evidence that any substitute parts are in compliance with the contract specification. Since such deviations from the express requirements of the contract would be for your convenience rather than at the Govern- *33 merit’s request, they would necessarily be made at a_ reduction in contract price or at no increase in contract price.
8. The Government desires to remind you again that you are obligated under the contract to deliver Generator Sets in accordance with the contract specifications and to comply with the contract delivery schedule. You are hereby notified again that if you attempt to qualify parts under the procedure outlined in paragraph 7 above and, as a consequence, fail to comply with the contract delivery schedule, the Government will be forced to pursue its rights under the “Default” Clause of the contract. You do not deny your obligation under the contract to deliver Generator Sets in compliance with the contract specifications. In view of the length of time required to conduct all tests required by the specifications (the endurance test alone requires a minimum of 42 days) it is difficult to understand how you expect to qualify untested parts or could have expected the Government to conduct necessary qualification tests. One of the First Articles is to be delivered to the Government within 90 days after contract award and it is contemplated by schedule paragraph 9(g) of the IFB portion of the contract that approval or rejection of the First Articles will be made by the Government within 20 days after submission of your test report on the First Article to be tested by you.
9. Under the terms of the contract, which incorporates Specification MIL-Q-5923, if you desire quality control inspection at source your purchase orders must include sufficient specification requirements to enable the source inspector to determine if the part being furnished under the purchase order is in compliance with the contract specifications.
10. It is understood by the Government from copies of proposed purchase orders exhibited by Mr. Eohr during the conference on_ 16 April that your purchase orders for the parts in question will state that parts to be furnished must be “identical” to the parts listed on the drawings and in accordance with all requirements of IFB 33-600-57-55. If it is your intention in placing such purchase orders to obtain parts of manufacturers other than those listed in the drawings and specifications for use on the Generator Sets to be furnished under the contract, the Generator Sets will be rejected for noncompliance with contract specifications unless such parts have been qualified and you secure approval of a deviation under the procedure outlined in paragraph 7 above.
John C. Powell,

Contracting Officer.

*34 APPENDIX B
MAHYCCB/CHK/vmc 7 May 1957.
International Fermont Machinery Company, Inc.
Bamapo, New York
Attention: Mr. David Bohr Vice President
Be: Contract AF 33(600) -34428 Approval of Source
Gentlemen:
Beference is made to your request for source approval as to Bogue Electric Company, Paterson, New Jersey.
Bogue Electric Company, Paterson, New Jersey, is approved as a source of supply with the understanding that the Air Force assumes no responsibility for the performance of the work and that your company, as prime contractor, is responsible for the proper functioning of any material, articles, spare parts, or work obtained thereunder and in compliance with the specifications and drawings called out in this contract.
In this connection your attention is specifically invited to letter dated 1 May 1957 from Headquarters, Air Materiel Command, forwarded through this office to you and inclosed herewith. This source approval does not in any way alter the determination expressed by the Procurement Contracting Officer in said letter.
You are further advised that this source approval is restricted solely to source generally and that the purchase order will require source inspection approval in accordance with paragraph 9 of the inclosed letter by the cognizant Air Force Quality Control Besident at your plant. It should be noted that purchase order Nos. 37-B-8-M07 and 37-B-9-M07 have been disapproved by the Quality Control Division at this office as not meeting contract specification.
Very truly yours,
Charles H. Keener,

Contracting Officer.

Incl
Ltr 5/1/57 frMCPMPG AMC, J. C. Powell, CO
Copy Furnished:
Mr. L. Colucci, AFQCB
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of *35 law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).

 The present plaintiff is the successor of International Vermont Machinery Co., Inc., which placed the bid and to which the award was made. Defendant asserts that there is insufficient proof that plaintiff acquired all the assets of Vermont (which was then dissolved) but, in the absence of any reason to doubt the affidavits offered by plaintiff, we accept (at the present stage of the case) those statements as adequate. See finding 2, footnotes 8 and 9. Although Vermont was in reality the contractor, we shall refer to plaintiff as such.

 It was a dear mistake to borrow the Beech specifications and drawings for the Government’s procurement without more editorial revision and adaptation. Those specifications and drawings were tailored to manufacture and procurement by Beech, a private concern — not by the United States. The trouble came about because the defendant’s contracting officials failed to modify the documents, which may have been adequate for a private procurement, so as to, make them entirely suitable for a public procurement through bidding.

 The Board of Contract Appeals did not reach, or make any observations on, the issue of what would have been the proper interpretation of the contract if the plaintiff had not acquiesced in the Government’s construction.

 The circumstances of the two meetings are elaborated in findings 16-18.

 After the conferences of December 19, 1956, and January 3, 1957, plaintiff twice extended the defendant’s time within which to consider whether to accept plaintiff’s bid.

 The evidence before the Board of Contract Appeals is part of the record in this court.

 As explained above, we can consider the judicial as well as the administrative record in this case because the defendant did not object at the trial to the receipt of the ie novo evidence.

 Plaintiff’s claims are entirely derivative. As a means of simplifying the text of these findings, hereafter, in describing actions that occurred while Fermont was in existence and before the time when the plaintiff asserts it acquired Fermont’s assets, “plaintiff” is used to refer to Fermont where it appears unnecessary to a clear understanding of the essential facts separately to identify Fermont and to distinguish it from the plaintiff corporation.

 The text of the affidavit is as follows:
*****
Pursuant to an agreement dated as of December 30, 1958, plaintiff WPC ENTERPRISES, INC., above named, acquired all of the outstanding capital stocfc of INTERNATIONAL FERMONT MACHINERY CO. INC., the party to the contract which is the subject of this action.
Thereafter, and in January of 1959, pursuant to corporate resolutions duly passed and adopted, the said INTERNATIONAL FERMONT MACHINERY CO. INC. was merged or consolidated with plaintiff WPC ENTERPRISES, INCORPORATED, in consequence of which the assets and liabilities of INTERNATIONAL FERMONT MACHINERY CO. INC. were absorbed into the above plaintiff, WPC ENTERPRISES, INCORPORATED, which thereupon emerged as the consolidated entity.

 The amount plaintiff claims for extra expense incurred' in procuring the five components from the suppliers named in the drawings, instead of from alternative sources the plaintiff had planned to use, totals $.327,998.77.

 The Bogue claim is for $72,330. It is alleged to represent materials, labor, overhead, engineering, drafting, G&A expense, and lost profit resulting from plaintiff’s cancellation of purchase orders issued to Bogue on March 26, 1957, for two of the generator’s components here in question (front drive motors and blower fans), and canceled May 9, 1957, after the plaintiff was informed that the defendant disapproved these purchase orders, and after Bogue had commenced work under them.

 This generator set was a complex piece of equipment. It had to be very precisely made in order to satisfy exacting requirements for so calibrating the aircraft’s electronic equipment that, after such calibration, the aircraft’s own power could be used without throwing the system out of calibration. It had taken about 3 years to develop the MD-3 into final configuration. Beech Aircraft Corporation had, previously manufactured it for the defendant on a negotiated procurement basis, as had Consolidated Diesel Company.

 There were over 250 spare parts specified to support the generator sets. The spare parts were the same as the corresponding components designated for the complete sets.

 When the plaintiff dismantled the sample models furnished, It was disclosed that some of the components of the samples had been made by manufacturers other than those/named in the Invitation.

 There was some discussion of the significance of the expression “or equal” on plaintiff’s list. It appears that Rohr said it was a gimmick used by the purchasing department to obtain more favorable prices than it would be able to get if it appeared that the sources named were sole sources. Whatever significance this colloquy may have had, taking account of the list in the MD-3 PARTS ESTIMATE, it is not apparent that defendant’s representatives were reasonably justified in regarding this explanation alone as dispelling the significance of either the specific mention of Rogue as an alternative source for two of the items in the list, or the footnote, both of which indicate clearly enough that plaintiff had in mind the possibility of furnishing components identical with the products of the named vendors but made by others.

 The full text of the letters of May 1, 1957, and May 7, 1957, is Included as appendices A and B.