### FRANCHI CONSTRUCTION COMPANY, INC.

### v.

### The UNITED STATES.

### No. 14–77.

United States Court of Claims.

Nov. 14, 1979.

Adrian L. Bastianelli, III, Washington, D. C., attorney of record, for plaintiff. Bastia-nelli & Thomas, Washington, D. C., of counsel.

Donnie Hoover, Washington, D. C., with whom was Acting Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and NICHOLS and SMITH, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's request, filed December 22, 1978, for review by the court of the recommended decision of Trial Judge George Willi, filed September 29, 1978, pursuant to Rule 166(c) on the parties cross-motions for summary judgment, having been submitted to and considered by the court on the briefs and oral argument of counsel.

■ Plaintiff criticizes the trial judge's calling the discrepancy between the specifications and the drawings "patent." It says if we agree with defendant that the precedence clause should be confined to instances of latent discrepancies, we should consider whether the discrepancy here was not rather a latent one. In the present case the conflict was not in fact noticed before plaintiff bid, and probably never would have been noticed except by one who was seeking light on the specific problem the discrepant provisions dealt with, and in the course of his investigation, placed them side by side. The trial judge did not define what he meant by a patent discrepancy. It is obvious that no careful writer of contracts would deliberately create a discrepancy, patent or latent, and then leave it to be resolved by the precedence clause. A discrepancy even with the precedence clause therefore indicates a probable mistake, which may be more or less serious. We would assume arguendo that a bidder, who noticed or should have noticed a serious mistake in the invitation or other of the contract documents, must divulge what he

has or should have noticed to the government, and will not in equity be allowed to profit by not doing so, as it would be an instance of overreaching. That is not this case, whether the discrepancy be patent or latent. Defendant does not accuse plaintiff of overreaching nor could it do so. The standard clause prescribes a precedence only in case of discrepancies between specifications and drawings, while one in figures, drawings, or specifications, each by themselves, must be promptly reported to the contracting officer. This no doubt reflects defendant's experience that the latter class of discrepancies is much more likely to be discovered early. We cannot in the circumstances say in face of the precedence clause, our characterization of a discrepancy as patent automatically triggers an obligation to report. The clause itself seems designed to excuse such reporting, instances where equity would intervene aside. Accordingly, we do not deem it necessary to address in a critical manner the characterization of the discrepancy as patent.

Since the court agrees with the trial judge's recommended decision and conclusion, as hereinafter set forth, it hereby affirms and adopts the decision and conclusion, together with the paragraph inserted above by the court, as the basis for its judgment in this case.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

By this suit plaintiff, a construction contractor, seeks reversal of a decision [1] of the Armed Services Board of Contract Appeals (the Board) affirming the contracting officer's denial of its claim for an equitable adjustment to compensate it for an alleged change in the terms of its fixed-price construction contract to build a three-story, 116-bed hospital for the Army at Fort Devens, Massachusetts.

The parties' cross-motions for summary judgment present the Board's decision for review subject to the finality features imparted to it by the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970).

The controversy concerns only the sequence in which vinyl-asbestos floor tile was to be installed on the ground floor of the building in relation to the Gypsum Wallboard (GWB) partitions to be constructed there; the question being whether the tile was to abut such partitions after they were erected on the concrete subfloor or was to be laid first, with the partitions placed on top of it. Incongruity as between the specifications and drawings is at the heart of the parties' disagreement over priority of installation.

The dispute did not surface until approximately a year into performance when plaintiff had the building under roof and in a weather-tight condition. At that point it began erecting GWB partitions on the concrete surface of the first floor. When it had installed about 5 or 10 percent of them in that manner, the contracting officer rejected the work contending that the contract required that such partitions be placed on top of the vinyl tile with which the floor area was to be finished. Though disagreeing with that interpretation of the contract, plaintiff removed the partitions complained of and complied with the directive. It thereafter filed a claim under the Changes article. It is the Board's affirmance of the contracting officer's denial of that claim that precipitated this suit.

In all significant respects, the facts of this case, as found by the Board, are beyond legitimate dispute. The result that follows from them depends upon whether the duty of inquiry that devolves on a construction contract bidder confronted with patently conflicting specifications and drawings persists even though the contract on which he is bidding contains a so-called order of precedence clause.[2] If it does, as held by the Board, plaintiff cannot recover. If the clause displaces that duty, by eliminating the conflict, plaintiff prevails. For reasons that will appear, it is held that on the facts of this case the clause predominates.

1. *Franchi Constr. Co.*, ASBCA No. 17958, 75–1 BCA ¶ 11,159.

2. Government Contracts, McBride & Wachtel, Vol. 1, § 2.180.

As required by the Armed Services Procurement Regulations,[3] Article 2 of the General Provisions of the subject contract reads as follows:

### SPECIFICATIONS AND DRAWINGS (JUNE 1964)

The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. *In case of difference between drawings and specifications, the specifications shall govern.* In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense. The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided. [Emphasis added.]

There are specifications dealing specially with GWB and with vinyl floor tile.

As the Board found,[4] section 6C of the specifications, "Gypsum Wallboard (Dry Wall)," is inconclusive on the question at issue. Without elucidation, it directs simply that the base members (runners) of the

partitions be "securely attached to floors." The vinyl tile specification is not similarly equivocal, however. Paragraph 6 of section 9E of the specifications, "Flooring; Vinyl-Asbestos Tile," is captioned "Installation of Tile." Subparagraph 6.1 directs that: "Installation of tile shall be deferred until all other work that might cause damage to the flooring has been completed." Subparagraph 6.4 specifies: "Tile shall be laid in accordance with the pattern layout starting from axes that will produce tile against opposite walls of equal width and not less than half the tile width." The Board read these provisions as being consistent *only* with a sequence of construction that provides for the walls or partitions to be installed before the tile is laid.[5]

Pointing squarely in the opposite direction is a note (note 3) on one of the contract drawings,[6] No. 32–02–01, sheet 41, titled "Door Elevations & Interior Finish Details." It directs that: "All partitions with GWB on both sides are to set on top of finish floor." Referring to the meaning and interrelationship of the drawing note and the tile specifications previously quoted, defendant says: "Both requirements are explicit and they are inconsistent." Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Defendant's Cross-Motion For Summary Judgment, at 19.

The notation is not, in terms, related to any of the detail drawings showing cross-sections of the base portion of five different types of interior walls and partitions that are shown above it and none of the parti-

3. 32 C.F.R. §§ 7.602, 7.602–2 (1969 Rev.).

4. 75–1 BCA at 53,159.

5. 75–1 BCA at 53,159. Moreover, although the Board did not specifically pronounce that work sequence as representative of normal trade practice, such is the clear implication of its opinion. There was much testimony on behalf of the plaintiff to that effect, none of which was either countered or in any way challenged by the defendant, whose briefing in the present proceeding tacitly concedes the point. Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Defendant's Cross-Motion For Summary Judgment, at 17–18. For the significance of trade practice on questions of

contract interpretation, *see Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 255, 512 F.2d 1082, 1089 (1975).

6. Though there is a reference on another drawing, No. 32–02–21, sheet 25, titled "Color & Finish Schedule No. 1," under the caption "Color Schedule," to laying vinyl-asbestos floor tile "wall-to-wall," it is clear on the face of the drawing that the reference is only to color configuration; the directive being that the field color pattern is to extend throughout the rooms in which installed, without a perimeter border of tile of a different color.

tions that are illustrated is of GWB construction on both sides. All of the cross-sections depicted, however, are oriented at their respective bases to a horizontal plane comprised of two closely aligned parallel lines, the upper one of which is labeled "Finish Floor." One of them shows the base of a partition finished with GWB on one side and plaster on the other positioned atop the upper horizontal line identified as "Finish Floor."

Relying on a paragraph [7] of section 3a of the specifications dealing with concrete, plaintiff's principal contention before the Board was that the "Finish Floor" appearing in the drawing note referred to the concrete surface to which tile was to be applied, rather than to the exposed surface of the installed tile. It therefore contended that as used in the note "Finish" meant texture (*i. e.,* monolithic finish), not state of completion of the work. The Board properly rejected this contention as opposed to both the obvious purport of the detail drawings and to the specific acknowledgement of plaintiff's project engineer in a written submission made by him in the early stages of the controversy. 75–1 BCA at 53,159.

The configuration of the drawings affirmatively discredits plaintiff's interpretation. It is undisputed that in no instance was the completed interior floor surface abutting the partitions shown on the drawings to consist of exposed concrete.[8] Those surfaces were to be of either ceramic or vinyl tile. Accordingly, if the line (labeled "Finish Floor") shown on the drawings as passing under the base of a partition represented tile surface on both sides of it, the line (being straight and uninterrupted) necessarily denoted the same material under the partition.

In sum, the Board correctly concluded that "Finish Floor" as used in note 3 meant vinyl tile. Although, with the drawing note so construed, it recognized that the specifications and drawings were in irreconcilable conflict as to those areas of the building where both GWB partitions and vinyl tile were to be installed, it went on to deny the claim by construing the contract in a way that it felt satisfactorily removed the contradiction. It invoked two familiar and related principles of interpretation,[9] *viz,* that potentially conflicting provisions should, if their language reasonably permits, be assigned meanings that will place them in harmony rather than discord. *Unicon Management Corp. v. United States,* 375 F.2d 804, 806, 179 Ct.Cl. 534, 537–38 (1967), and that a provision directed to a particular matter prevails over one which is general in its terms. *Hol-Gar Manufacturing Corp. v. United States,* 351 F.2d 972, 980, 169 Ct.Cl. 384, 396 (1965).

The Board reasoned that congruity resulted if the tile specification's scope were confined to only the second and third floors of the building, where no GWB partitions were to be found, leaving the drawing note free to govern the areas (primarily the ground floor) calling for such partitions. The difficulty with this approach is that it relieves conflict by means of segregation rather than integration. Thus, the provisions no longer collide only because their

---

7. That paragraph provided in part:

"22. CONCRETE FLOOR AND ROOF SLAB FINISHES. * * *.

"22.1 *Monolithic finish.* Except where otherwise specified, the concrete for floor and roof slabs shall be screeded and floated with straightedges to bring the surface to the required finish level with no coarse aggregate visible. The concrete, while still green but sufficiently hardened to bear a man's weight without deep imprint, shall be wood-floated to a true, even plane with no coarse aggregate visible. Sufficient pressure shall be used on the wood floats to bring moisture to the surface. After the surface moisture has disappeared, surfaces shall be steel-troweled to a smooth, even, dense finish, free from blemishes including trowel marks."

8. Paragraph 22.1 of the concrete specifications, note 7, *supra,* does not apply to the surface texture of concrete that is not to be covered. Such surfaces are governed by paragraph 21.1 of the same specifications. That paragraph, titled "Smooth Finish" directs that: " * * * smooth finish shall be given to interior and exterior concrete surfaces that are to be painted or exposed to view as finished work. *   *.'"

9. 75–1 BCA at 53,159–60.

respective coverages have been made mutually exclusive. The coordination of which *Unicon* speaks occurs where competing provisions can reasonably be read to operate compatibly on the *same* aspect of the contract work. There the court found a flooring specification that was silent on the includability of a steel plate to be open to complementation by a drawing calling for such a plate. The language of the tile specification here involved affords no such latitude. That it does not serves both to distinguish the situation at hand from that presented in *Unicon, supra,* and to render the specific versus general principle inapplicable. The generality comprehended by that principle must emanate from the contract language.[10] In the case of a provision explicit in its terms, generality is not created by a mere showing that the provision can be subordinated in the definition of one aspect of the contract work and still have room to function viably elsewhere. As the defendant forthrightly confirms,[11] the tile specification is no less complete and specific in terms than is the drawing note. Accordingly, the textual prerequisite to application of the principle is notably lacking in this instance.

Ultimately, the Board alluded to the real crux of this case—the impact of the order of precedence clause. Properly characterizing the interrelationship of the tile specification and drawing note as one of patent conflict, the Board declared: "A contractor may not resolve such a patent conflict between specifications and drawings by resort to the General Provision Article 2 admoni-

tion that specifications control over drawings, since that pertains only to such differences as do not require clarification at the bidding stage. See *Peter Kiewit Sons' Company,* ASBCA No. 15855, 71–2 BCA ¶ 8959." 75–1 BCA at 53,160. Though the Board was faithful to the prior holding, albeit *obiter,* on which it relied to support the limitation that it imposed on the scope of the order of precedence clause,[12] it failed to acknowledge earlier Board pronouncements to the contrary. For example, in *Sides Construction Co.,* ASBCA No. 9539, 1964 BCA ¶ 4342 the Board, dealing with a standard order of precedence clause, said: "We have no difficulty in affirming the principle that in such cases of *patent and irreconcilable discrepancy* between the specifications and drawings, the specifications govern." (Emphasis added.) In *Mapp Contracting Co.,* ASBCA No. 12205, 68–1 BCA ¶ 6754, the Board declared that the standard clause "would require that the specifications be given precedence over an antagonistic indication on the drawings" where there was "essential repugnancy" between the two.

■ It distinctly appears that in order to constitute the "difference" contemplated by the order of precedence clause, specifications and drawings must be in the same degree of affirmative conflict[13] that the present Board deemed to disqualify the clause and impose a duty of inquiry on the contractor. With due deference, that conclusion cannot be permitted to stand. The Government authored the order of precedence clause as a mechanism to automatical-

**10.** 4 Williston on Contracts (3d ed.), § 619, at 743, *et seq.;* Restatement, Contracts, § 236(c).

**11.** *Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Defendant's Cross-Motion For Summary Judgment,* at 19.

**12.** In *Peter Kiewit Sons' Co.,* ASBCA No. 15855, BCA 71–2 ¶ 8959, at 41,648, the Board said: "Even if we assume that appellant's interpretation of the specification, when read by itself, is correct, the discrepancy between the specification, thus interpreted, and the drawings should have been so great and so obvious as to have imposed a duty on appellant to inquire. *Pulis Builders, Inc.,* ASBCA No. 10953, 66–2 BCA ¶ 6059. That duty was not

abrogated by the provisions of General Provision 2, a standard clause in construction contracts. The sentence therein which is relied upon by appellant: 'In case of difference between drawings and specifications, the specifications shall govern,' clearly applies only to 'differences' which are not so obvious as to have required such inquiry or have not been resolved even though proper inquiry was made."

**13.** *A. A. Maintenance Co.,* ASBCA No. 7209, 62 BCA ¶ 3307; *Harrelson Corp.,* ASBCA No. 7224, 61–2 BCA ¶ 3107; *Jamsar, Inc.,* ASBCA No. 14850, 71–1 BCA ¶ 8907.

ly remove conflict between specifications and drawings by assigning preeminence to the former. As an additional initiative, the clause imposes an affirmative duty of inquiry on the contractor who is confronted with a particular dilemma, *viz*, discrepancies within, as opposed to between the separate categories of, *inter alia*, drawings and specifications. *Glen N. Allen*, ASBCA No. 12728, 68–1 BCA ¶ 6807, at 31,467. In this case there is no conflict among either the drawings, as a whole, or the constituent provisions of the specifications.

The plaintiff is entitled to take the Government sponsored order of precedence clause at face value. *WPC Enterprises Inc. v. United States*, 323 F.2d 874, 876–77, 163 Ct.Cl. 1, 6–7 (1963). Once its right to do so in the present situation is recognized, no conflict sufficient to occasion inquiry[14] remains for, as the Board acknowledged,[15] the specifications in issue are consistent *only* with the sequence of work from which the plaintiff was compelled to depart. The Board found that this enforced change significantly increased the cost of construction.[16] Plaintiff is therefore entitled to a compensatory equitable adjustment under the Changes article.

## CONCLUSION

Plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied and the case is remanded to the Armed Services Board of Contract Appeals pursuant to Rule 149 for determination of the amount of the equitable adjustment due plaintiff with further proceedings before this court stayed for a period of six (6) months from the date hereof. Plaintiff's counsel is designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Board is also directed to Rule 150.

14. *Cf. Merando, Inc. v. United States*, 201 Ct.Cl. 23, 26–27, 475 F.2d 601, 602–03 (1973); *Bishop Eng'r Co. v. United States*, 180 Ct.Cl. 411, 415 (1967); *Blount Bros. Constr. Co. v. United States*, 346 F.2d 962, 972–73, 171 Ct.Cl. 478 (1965).