918 F.2d 187
 37 Cont.Cas.Fed. (CCH) 76,025
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
T.F. POWERS CONSTRUCTION COMPANY, Appellant,
v.
The UNITED STATES, Appellee.
 No. 90-1144.
 United States Court of Appeals, Federal Circuit.
 Oct. 15, 1990.
 
 Before NIES, Chief Judge, and ARCHER and CLEVENGER, Circuit Judges.
 DECISION
 CLEVENGER, Circuit Judge.
 
 
 1
 T.F. Powers Construction Company ("Powers") appeals from three decisions made by the Armed Services Board of Contract Appeals ("Board") after a consolidated proceeding in which Powers's claims for equitable adjustment were denied. All three claims arise out of a contract awarded to Powers "to alter and upgrade four two-story unaccompanied enlisted personnel housing (UEPH) buildings at Minot Air Force Base" in North Dakota. In re T.F. Powers Construction Co., ASBCA Nos. 38031, 38479 and 38872, slip op. at 1 (Armed Services Board of Contract Appeals Nov. 20, 1989) ("Powers"). In two of the three claims on appeal, Powers asserts its interpretation of specific contract terms. In the other, Powers seeks reversal of the Board's conclusion that Powers was charged with knowledge of particular site conditions shown in the contract drawings. Because the Board's interpretations of the contract are correct and Powers has not shown the Board's conclusion to be in error, we affirm. Since the operative terms and facts of each claim are not related, we deal with each separately.
 
 OPINION
 I. THE BATHROOMS
 
 2
 As part of the housing renovation, Powers was to renovate bathrooms located in each of the sleeping rooms of the dormitories. The bathroom renovation included supplying and installing new bathtubs and new ceramic tile for the bathroom walls. Powers's first claim is for an equitable adjustment to pay for the installation of waterproof wall coverings above the bathtubs in the renovated bathrooms.
 
 
 3
 Powers was supplied with specifications and drawings that described the extent of the work to be performed. The drawing at issue depicts the bathrooms and appears to require the installation of a fiberglass bathtub and shower combination unit with doors. Drawing A-45, entitled TYPICAL BATHROOM PLANS ("FIBERGLASS BUT/SHOWER COMBINATION W/DOORS"). The specifications flatly contradict this apparent requirement. The "[s]pecification [at] Section 15C, PLUMBING, GENERAL-PURPOSE, called for the installation of showers and new enamelled cast iron bathtubs" instead of the fiberglass single unit. Powers at 2. Both parties concede the blatant conflict between the specifications and the drawing. There is also no dispute that Powers was to rely on the written specifications rather than on the drawing, because the contract contains a clause that directs the contractor to follow the specifications when a conflict exists between specifications and drawings. Powers at 4 (citing General Clause 58, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION). Neither party contends that there was any ambiguity with regard to the plumbing fixtures required by the contract.
 
 
 4
 With regard to the ceramic wall tile, "Drawing A-11, [entitled] ROOM FINISH SCHEDULE, and Specification Section 9G, [entitled] DECORATING SCHEDULE (INTERIOR DESIGN SCHEDULE), called for all the walls in the bathrooms to be ceramic tiled." Powers at 2. The specifications further state that "tile shall be ... in colors as specified in SECTION: DECORATING SCHEDULE," Sec. 9B-2 at p 5.1, and that "[t]ile in colors and patterns indicated shall be supplied in the areas shown on the drawings." Specification Sec. 9B-3 at p 6. Id. Drawing A-45 depicts the location of the ceramic tile by the use of cross-hatching. Testimony of Mr. Giere, Corporate Secretary for Powers. Since drawing A-45 erroneously depicts a fiberglass tub/shower combination, there is no cross-hatching in the area immediately above what should be the location of the enamel tub. On the other hand, cross-hatching is present on all otherwise uncovered wall surfaces.
 
 
 5
 Powers contended that since the specifications only require ceramic tile as depicted in the drawing, and there is no ceramic tile depicted in the drawing above the putative location of the enamel tub, the contract does not call for any type of water resistant wall covering above the enamel tub. No doubt flabbergasted by Powers's interpretation of the contract, the contracting officer directed Powers to install a fiberglass tub-surround to protect the uncovered wall. Powers seeks equitable adjustment for what it considers a constructive change order.
 
 
 6
 The Government asserts that the contract required ceramic tile as protective wall covering in the bathbay area because, as the Board found, "the ROOM FINISH SCHEDULE on Drawing A-11 and specification Section 9G, DECORATING SCHEDULE, call for all bathrooms walls to be covered with ceramic tile." Powers at 5. The government further asserts that "drawing A-45, TYPICAL BATHROOM PLANS, shows that, where not otherwise covered, the walls in the bathbay area are to be covered with ceramic tile." This assertion requires us to replace the fiberglass tub/shower depicted with an enamel tub. The Government's argument next requires the now exposed wall imputed to the drawing to be covered with cross-hatching. These steps taken, drawing A-45 would require ceramic tile to be installed in the bathbay area.
 
 
 7
 The Board agreed with the government and held that the terms of the contract "call for all bathroom walls to be covered with ceramic tile." Powers at 5. Furthermore, the Board found that the failure of the tile subcontractor to include tile for all uncovered walls did not absolve Powers of its duty to bid the contract as its terms dictated. Id.
 
 
 8
 The issue here is one of contract interpretation. "[T]his dispute, turning as it does on an interpretation of contract provisions, involves a question of law which the court is free to answer independently of the Board's decision." HRH Construction Corp. v. U.S., 428 F.2d 1267, 1271 (Ct.Cl.1970). Powers contends that the contract requires tile only where explicitly depicted on the drawings by cross-hatching. The Government contends that specification section 9G-14, ROOM FINISH & COLOR SCHEDULE, and drawing A-11 definitively require "tile on all four walls." However, Powers responds that neither this specification section nor this drawing give any "indication as to where the tile is to be located on those walls" and that, notwithstanding anything implicitly therein to the contrary, the contractor is required expressly by specification section 9B-3, p 6, to place "[t]ile in colors and patterns indicated ... in the areas shown on the drawings." Powers thereby asserts that drawing A-11 and specification section 9G-14 merely "list[ ] each room individually, with columns to show what finish the room was to receive on its floor, ceiling, walls, and doors" as stated at specification Sec. 9B-2, p 5.1 and Sec. 9G-3, p 7, rather than identifying the specific locations of the finish on each wall or door. Marden Corp. v. United States, 803 F.2d 701, 702 (Fed.Cir.1986) (emphasis added). Powers's interpretation is consistent with these other specification sections. The government's position would require us to find a conflict between section 9G-14 of the specifications and both 9B-2, p 5, and 9B-3, p 6. "[P]otentially conflicting provisions should, if their language reasonably permits, be assigned meanings that will place them in harmony rather than discord." Franchi Constr. Co., Inc., v. United States, 609 F.2d 984, 988 (Ct.Cl.1979) (citing Unicon Management Corp. v. United States, 375 F.2d 804, 806 (Ct.Cl.1967).
 
 
 9
 Alternatively, the Government contends that the contract requires tile wherever the bathroom wall is otherwise uncovered whether explicitly or implicitly shown on drawing A-45. The Board found the contract to require tile on the surface in question, but did not address the question of whether this drawing was ambiguous.
 
 
 10
 Insofar as the tub-tile controversy in this case is concerned, the parties would have it that there is no ambiguity in the contract, because each is convinced of the complete propriety of its interpretation and the complete error of the other's. The existence of such a controversy, under our precedent, establishes that an ambiguity exists, H & M Moving, Inc. v. U.S., 499 F.2d 660, 670-71 (Ct.Cl.1974), and compels us to define the nature of the ambiguity. "The first issue is whether the discrepancy, omission or ambiguity was drastic, glaring or patent." Mountain Home Contractors v. U.S., 425 F.2d 1260, 1263 (Ct.Cl.1970) (citations omitted). "If this issue is answered in the negative, we must reach the second issue, whether plaintiff's interpretation of the ambiguous provisions was reasonable." Id. In that event, the contractor will prevail with respect to the latent ambiguity under the doctrine of contra proferentum, Sturm v. U.S., 421 F.2d 723, 727 (Ct.Cl.1970), if the contractor establishes reliance on that reasonable interpretation in bidding the contract. United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed.Cir.1987).
 
 
 11
 In this instance, the conflict between the specifications and the drawing as to whether the servicemen would enjoy a cast iron tub or a fiberglass tub-shower combination unit does not clarify the dispute over whether wall covering is required above the tub. In order to appreciate the disagreement between Powers and the Government over wall covering, a number of mental processes, detailed above, must be employed. In such circumstances, the ambiguity lacks the glaring quality required for patency, Beacon Construction Co. v. U.S., 314 F.2d 501, 504 (Ct.Cl.1963), and instead, as to the tile, takes on the character of a latent ambiguity.
 
 
 12
 Having reached that conclusion, we must determine whether Powers's interpretation was reasonable. Powers's reading requires that the bathrooms be renovated by installing new plumbing, fixtures, and tile, and then turned over to the Government in an unusable state. The bathroom is left with an exposed wall that is enclosed by the tub and shower doors--the only wall area that is showered continuously with water from the shower head. Powers's interpretation speaks for itself. It is clearly unreasonable.
 
 
 13
 We therefore hold that the contract required the placement of tile on the surface in question. The Board found that the tub-surrounds that Powers actually supplied were less expensive than the required tile, and Powers was not harmed by the substitution. We affirm the denial of Powers's claim for an equitable adjustment for the tub-surrounds.
 
 II. THE ELECTRICS
 
 14
 The contract also "called for the removal and reinstallation of the electrical system in the four buildings to be altered." Powers at 5-6. Again, drawings, including architectural, structural, electrical, mechanical, and demolition drawings, were supplied to develop cost estimates for the bid and a plan for proceeding with the renovation. Powers's electrical subcontractor "elected to install the new electrical conduit by running the wiring the length of the corridors, interrupting the conduit at designated locations with a junction box and run[ning] wiring from the junction box into the ceiling spaces above the rooms being rewired." Id. Mr. Henderson, who prepared the electrical subcontractor's cost estimate, testified that the electricians had developed this plan themselves although the "contract drawings kind of lead you that way," Testimony at I-164, Powers, and that "the contract drawings [al]luded to and kind of suggested that we wire everything from the corridors." Id. at I-167. Therefore, although the demolition drawings may have facilitated a contractor in developing its plan, the Board found that "[n]either the specifications nor the drawings told the contractor how it should install the wiring for the new electrical system." Powers at 6. Mr. Henderson further indicated that the electricians had hoped to run wire into the rooms with a minimum of damage to the ceilings by fishing for the flexible conduit through a small hole in each room ceiling. This proved impracticable because of the presence of a steel I-beam above the wall separating the corridors from the rooms. The ceilings therefore were virtually demolished in order to obtain access to the junction boxes. Powers had submitted a claim for the demolition and patching which it contended resulted from "a latent physical condition at the site differing materially from those indicated in the contract documents." Powers at 8. The claim was denied. The I-beams had been depicted on architectural drawing A-54 and mechanical drawing M-17, although the former drawing did not show the full extent of the beam.
 
 
 15
 On appeal to the Board, Powers argued that it should be charged only with knowledge of the contents of those drawings bearing directly on the electrical work and that were actually reviewed by its electrical subcontractor--the electrical drawings and the demolition drawings. Powers cited the testimony of Mr. Henderson. Mr. Henderson stated that he had not, in fact, reviewed the pertinent mechanical and architectural drawings in developing the subcontractor's bid. He did state that he normally reviews mechanical drawings, but did not in this case because there were no "critical areas in the mechanical" drawings that were relevant to his subcontract since the motor control work was to be performed by the "mechanical division." Transcript at I-155-56, Powers. On cross-examination, Mr. Henderson stated that he is generally interested in conditions in existing corridors. Id. at I-195.
 
 
 16
 The Board held that Powers "is charged with knowledge of what is required by all the specifications and drawings." Id. at 9. The Board therefore held that Powers "has failed to prove the 'I' beams encountered was not foreseeable on the basis of all the information available at the time of bidding." Id.
 
 
 17
 Powers reiterates its arguments here--that the specifications and drawings were defective in not showing the I-beams, which therefore constitutes a "differing site condition," that the drawings required Powers to pass flexible conduit from the corridors into the rooms, and that Powers and its electrical subcontractor should not be charged with knowledge of more than the structural, demolition and electrical drawings when preparing an estimate of the cost of electrical work as part of a general contract bid.
 
 
 18
 The I-beams in question are clearly depicted on drawing M-17 which was put into evidence. Powers's contention that the site conditions differed from those shown in the pre-bid documents is untenable.
 
 
 19
 We reject Powers's contention that the contract required it to wire the rooms from the corridors with flexible electrical conduit. Mr. Henderson's testimony does not support this argument. The eventual plan for wiring was developed independently by the electricians although they may have thought the reviewed drawings "kind of suggested" or "kind of lead you that way."
 
 
 20
 Powers's only remaining argument is that a general contractor in preparing the electrical cost estimate as a component of a bid should not be charged with knowledge of the contents of drawings that are not relevant to electrical work. The Board stated that Powers, "as the prime contractor, is charged with knowledge of what is required by all the specifications and drawings." Powers at 9. The Board has consistently applied its rule that the prime contractor is responsible for, and charged with, knowledge of the entire contract and that the Government is not required to separate work between various trades in preparing the specifications and drawings. In re Santa Fe Engineers, Inc., ASBCA No. 24467, 80-2 BCA (CCH) 14763 (1980); In re Hoel-Steffen Construction Co., ASBCA No. 23442, 79-1 BCA (CCH) 13714 (1979); In re The Fonda Corp., ASBCA No. 22500, 78-1 BCA (CCH) 13180 (1978); In re Gall Landau Young Construction Co., Inc., ASBCA No. 21549, 77-1 BCA (CCH) 12515 (1977); In re Halvorson-McLaughlin Constructors, ASBCA 12147, 68-1 BCA (CCH) 6814 (1968); In re Fullerton Construction Co., ASBCA No. 11618, 67-1 BCA (CCH) 6301 (1967); In re Ruscon Construction Co., ASBCA No. 9371, 65-1 BCA (CCH) 4599 (1964). See also 8 McBride, GOVERNMENT CONTRACTS Sec. 49.110(6) (1990). Powers does not challenge the Board's line of decisions holding that, notwithstanding industry trade practice, contracts issued by the Government need not be divisible by trade. Nor could it. Mr. Henderson's testimony relates to his actions in this case, not industry practice, nor even his own general practice. We therefore affirm the decision of the Board on the claim for equitable adjustment relating to the electrical work.
 
 III. THE ROOF
 
 21
 Finally, Powers submitted a claim for the cost of sealant used to seal side laps of the roofing panels. The contract called for Powers to re-roof the dormitories. The specifications called for factory-applied sealant at the roof panel side laps and end laps. The specific sentences read: "Sealant for the standing seams [i.e., end and side laps] shall be factory applied." Sec. 7B-3 at p 6.1 (see Powers at 9). And later: "Side laps shall have factory applied sealant." Sec. 7B-6 at p 7.3 (id.). After selecting a roof, Powers submitted a Manufacturer's Certification of Compliance Form listing "Ultra Roof" as the supplier of "Insulating Compound" for the roof with a reference to an attached letter. The form was signed by a Government civil engineer. The attached letter was from Powers's roofing subcontractor and stated that "Ultra Roof does not recommend side lap sealant, and does not have end laps."
 
 
 22
 During installation of the Ultra Roof product, the Government contracting officer required Powers to caulk the side laps with sealant, despite Powers's claim that "[t]his is contrary to previously approved submittals and the manufacturer's recommendations." Powers submitted a claim for roof panel caulking which was denied.
 
 
 23
 Powers argued to the Board that since the Ultra Roof manufacturer recommended no sealant, and since one part of the contract states that "SEALANT shall be as recommended by the metal roofing manufacturer, as best suited for the particular joint," that the contract required no sealant for this roof. Powers at 11 (citing Sec. 7B-6.6). The Board rejected this argument, stating, "[t]his interpretation is strained when viewed in terms of the [other] cited sections of the specifications which clearly call for 'factory applied' sealant at the side laps. The manufacturer's obligation was only to recommend the sealant best suited for the particular joint and not to write out of the contract the use of sealant altogether. To read specification section 7B-6.6 otherwise would render the other specification sections meaningless." Powers at 11.
 
 
 24
 In this appeal, Powers contends again that its reading that no sealant was required for this roof was the proper reading of the contract. We reach the same conclusion as the Board on the same basis. The Board found that Powers's reading of the contract must "give[ ] meaning to, and harmonize[ ] all relevant provisions, with the effect of not rendering any relevant terms superfluous or nugatory." Powers at 11. Powers's interpretation ignores those sections of the contract that require the use of sealant at the standing seams. We may not accept an interpretation of a contract "which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." Hol-Gar Mfg. Corp. v. U.S., 351 F.2d 972, 979 (Ct.Cl.1965).
 
 
 25
 Powers additionally urges that the Government's "approval" of the Ultra Roof was a constructive change order that relieved Powers of the obligation to provide factory applied sealant. However, we do not construe the civil engineer's signature on Powers's submitted certification as constituting a change order, even were the civil engineer authorized to issue a change order. The form in question, ENG FORM 4025, entitled "Transmittal of Shop Drawings, Equipment Data, Material Samples, or Manufacturer's Certification of Compliance," cannot be held to have the legal effect of requiring Powers to disregard the plain meaning of the contract terms in question, which required Powers to apply sealant to the side laps. We affirm the decision of the Board that Powers is not entitled to an equitable adjustment for roof caulking; we therefore affirm the Board's decision in all respects.