an order will be issued scheduling required pretrial submissions.

**BETA CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 94–585C.

United States Court of Federal Claims.

Oct. 31, 1997.

Leonard A. Sacks, Rockville, MD, with whom was David Hilton Wise, attorneys of record, for plaintiff.

Andrea I. Kelly, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Frank W. Hunger, David M. Cohen, and Kirk T. Manhardt, attorneys of record, for defendant.

*OPINION*

HORN, Judge.

*FACTS*

The General Services Administration (GSA) issued an invitation for bids for the "Roof Replacement" on a building located at 451 7th Street, N.W., Washington, D.C., in which the Department of Housing and Urban Development (HUD) is located. Beta Construction Company, Inc. (Beta) submitted a proposal responding to the solicitation. On October 17, 1991, GSA awarded Beta Contract No. GS–11P–91–MKC–0226 in the amount of $943,000.00 to perform the roof replacement on the HUD building.

The scope of the work to be performed under the contract was summarized in Specification Section 01010, Summary of Work, which labeled the project as a "Roof Replacement." Paragraph 1.2 of Specification Section 01010 states:

E. *Abbreviated Written Summary:* Briefly, and without force and effect upon contract documents, work of contract can be summarized as follows:

1. Replacement of existing built-up roof with new inverted roof membrane assembly.

   a. includes drain replacement and related interior cutting and patching.

2. Removal of existing asbestos containing roof materials.

3. Rerouting of HVAC refrigerant lines.

4. Installation of high profile davits & safety tie-back anchors.

5. Installation of hose bibs & weatherproof outlets.

6. Removal of existing roof access doors and replacement with new.

The contract specified that portions of the roofing contained asbestos and, thus, required the use of asbestos abatement procedures to remove those areas of the roof. The joint stipulation of facts states that the scope of the work can be summarized as "removal of the existing roof and replacement with a new inverted roof assembly, including associated work involving removal of asbestos containing roof materials. . . ."

GSA issued a notice to proceed on November 7, 1991. Beta originally subcontracted with Asbestos Mid–Atlantic to perform the asbestos abatement work on the contract. Beta, however, terminated Asbestos Mid–Atlantic's subcontract in February, 1992. Beta then entered into a subcontract with AB-TEC, Inc.[1] to perform asbestos abatement on the project.

The "Asbestos Abatement Plan" was defined in the contract drawings as referred to by Specification Section 02085R, paragraph 1.1(A)(2). Specification Section 02085R, paragraph 1.1(A) directs all references regarding the abatement of asbestos to the project's contract drawings without further explanation:

1. *Work Area:* The work areas include the roof areas outlined on the contract drawings.

2. The following asbestos-containing materials are to be removed:

   See contract drawings.

Contract Drawing C–1 is the cover sheet for the project's contract drawings and illustrates the Asbestos Abatement Plan, and Contract Drawings 3–1, 3–2 and 3–3 depict the demolition details.[2] In particular, Contract Drawing C–1 delineates the areas of the roof for asbestos abatement as a three-foot wide strip running parallel to the parapet, equipment curb and expansion joint walls, an oblong area on the main roof, and selected penetration flashing. The notes on Contract Drawing C–1 explicitly state:

1. REMOVE ASBESTOS CONTAINING ROOFING & (VERT) FLASHING 3'–0" FROM VERT FACE OF PARAPET, EQUIPMENT CURBS &

---

1. ABTEC, Inc. is referred to throughout the pleadings as both "Abtec" and "ABTEC," and once even as ABTEK. For the sake of uniformity, the court will refer to the corporation as ABTEC.

2. Contract Drawings C–1 and 3–1 were the only drawings submitted to the court by the parties prior to oral argument. At oral argument, the defendant provided the court with the entire set of drawings created for the invitation for bids for the project that is at issue in this litigation.

EXPANSION JOINTS & AS SHOWN IN SHADED AREAS.

2. REMOVE ASBESTOS CONTAINING PITCH POCKET, VENT, ROOF DRAIN, ROOF VENT & PIPE FLASHING IE: (ALL PENETRATION FLASHING).

The focus of the litigation before this court is the extent of asbestos abatement to be undertaken in the areas along the walls defined by Note 1 on Contract Drawing C–1. In general, the roof area to be demolished and removed using asbestos abatement procedures contained asbestos contaminated fabric base flashing, which was fastened to parapet, equipment curb and expansion joint walls, and then extended down the walls over a cant strip and horizontally across the roof. The flashing material was attached with an asphalt coating to a "built-up roofing" (BUR) system, which included rigid insulation that was attached with asphalt, and, the insulation, in turn, was attached to the concrete fill layer atop the concrete roof deck with asphalt.[3]

The contract drawings provided to Beta define the areas to be removed under the asbestos abatement program. Contract Drawing C–1, in the portion of the drawing and text captioned "Asbestos Abatement Plan," states: "REFER TO PLAN SHTS 3–1 THRU 3–3 FOR ADDITIONAL DIMENSION INFORMATION." All of the referenced drawings, Contract Drawings 3–1, 3–2 and 3–3, articulate demolition instructions, in pertinent part, as follows:

1. REMOVE EXIST BUR MEMBRANE & INSULATION DOWN TO EXIST CONC DECK.

2. REMOVE ALL EXIST PIPE FLASH (4″ TYP UNLESS NOTED OTHERWISE).

3. REMOVE ALL PERIMETER METAL COUNTERFLASHINGS & MEMB. BASE FLASH EXCEPT AS NOTED OTHERWISE. SEE DETAIL 6/3–1. SEE COVER SHEET FOR ASBESTOS ABATEMENT.

These demolition illustrations, moreover, repeatedly state that the contractor is to "REMOVE RIGID INSULATION."

The contract also included specifications for preparing to remove the asbestos containing roofing materials. Specification Section 02085R of the contract, Asbestos Abatement Procedures, paragraph 3.1, Roofing Removal, provides in pertinent part:

3.1 *PREPARATION:*

A. *Isolate* the roof work area for the duration of the work by completely sealing off all building openings at the designated work area, including but not limited to, heating and ventilation intake ducts, doorways, corridors, windows, and lighting with plastic sheeting taped securely in place.

B. *Install the Decontamination Facility* at a roof access way. All entry and exit to the roof work area is to be through this facility.

C. *Cover all ventilation openings within* 100 feet of the work area with plastic sheeting taped and fastened securely in place to protect from damage.

D. *Before the work is begun,* clean all specified removable items and equipment. Remove them from the roof work area and store as directed.

E. *Cover all remaining nonremovable items* and equipment in the work area with plastic sheeting taped securely in place.

F. *Post warning sign* and labels as required by 29 CFR 1910.1001, 29 CFR 1926.58, ASTM E 849, and as directed by the Contracting Officer.

The contract further specified the construction of a decontamination system for the workers involved in removing the asbestos containing roofing materials. Specification Section 02085R of the contract, Asbestos Abatement Procedures, paragraph 3.2, Roofing Removal, provides in pertinent part:

**3.** In a letter dated April 20, 1992, Beta presented a laboratory report that indicated trace amounts of asbestos were present in the roofing asphalt used to attach the various layers of the roof.

B. *Decontaminatin [sic] System:* Prepare the work area as specified in section 3.01. Construct a worker decontamination system consisting of three chambers as follows:

1. An equipment room (or area) with airlocks to the shower room.

2. A shower room with two airlocks, one to the equipment room and one to the clean room. The shower room shall consist of at least one shower per eight workers, with hot and cold running water. Careful attentin [sic] shall be paid to shower enclosure to ensure against leaks of any kind. ·

   a. Ensure a supply of soap and shampoo, and bath size disposable towels at all times in the shower room.

   b. The waste water shall be either stored to be removed and disposed of as asbestos waste or shall be filtered through a 5 micron filter to an available and suitable drain.

3. The clean room shall have sufficient space for storage of the workers' street clothes, towels, and other non-contaminated items.

4. The entrance of the clean room must have a lockable door that has a sign as follows:

DANGER
ASBESTOS
CANCER AND LUNG DISEASE HAZARD
AUTHORIZED PERSONNEL ONLY
RESPIRATORS AND PROTECTIVE CLOTHING ARE REQUIRED IN THIS AREA

5. Signs, as such, shall be posted at all entrances to the work area including all sealed and/or locked entrance ways.

The contract also outlined the steps to be taken in removing the portions of roofing which contained asbestos from the HUD building. Specification Section 02085R, Asbestos Abatement Procedures, paragraph 3.3, Roofing Removal, provides in pertinent part:

3.3 *ROOFING REMOVAL:* The following is a basic outline of the steps that will be taken during the removal of asbestos containing roofing from buildings. The plan of action submitted for approval by the contractor should address these points.

A. *Size of Work Area:* The estimated amount of roofing material to be removed per work area should be defined, as well as an estimate of the number of work areas to be removed per day should be described.

B. *Aggregate Removal:* The roofing aggregate is cleared away from the roof removal area.

C. *Marking:* The sections of roofing to be removed are marked off.

D. *Wetting:* The roofing material to be cut will be wet along the cut line, just prior to cutting, with an EPA approved wetting agent. (The use of roof cutters equipped for continuous application of water and wetting agent will be permitted.)

E. *Cutting:* The roof will be cut into manageable pieces. When a mechanical roof cutter is used, the cutter head will be equipped with an exhaust hood connected to a HEPA filtered, local exhaust ventilation unit or continuous wetting equipment.

F. *Removing:* Lift the cut sections and wrap them in two layers of 6 mil polyethylene sheeting. Handle the material in a non destructive fashion to minimize breakage and dust generation. Secure the sheeting securely with tape.

G. *Cleaning roof work area:* Vacuum the remaining dust with a HEPA vacuum cleaner. Dispose of the dust as asbestos contaminated material.

H. *Transporting:* Carry the materials to a container for transport to an EPA approved landfill.

The contract also specified how to maintain the portions of the roof where asbestos-tainted materials were being removed and, in conjunction with paragraph 3.3 above, how to

dispose of the asbestos containing roofing materials. Specification Section 02085R, paragraph 3.5, provides in pertinent part:

    B. *Housekeeping:* Essential parts of asbestos dust control are housekeeping and cleanup procedures. Maintain all surfaces on the roof area free of accumulations of asbestos fibers to prevent further dispersion. Give meticulous attention to restricting the spread of dust and debris, keep waste from being distributed over the general area or to lower floors. Use approved industrial vacuum cleaners with a HEPA filter to collect dust and small scrap. The blowing down of the work area with compressed air is forbidden. Post appropriate asbestos hazard warning signs. In all possible instances workmen shall cleanup their own areas. Equip personnel engaged in cleaning up asbestos scrap and waste with necessary respiratory equipment and protective clothing.

    C. *Disposal of Asbestos Containing Roofing Materials:* The method of disposal of roofing material is discussed in paragraph 3.3. (Essentially roofing materials may be dumped in any EPA landfill practicing daily cover.) Collect and dispose of all other asbestos containing waste, scrap, debris, bags, containers, equipment, and asbestos contaminated clothing in properly labeled and sealed impermeable bags. Prior to placing in bags, or containers, wet down asbestos wastes to reduce airborne concentrations.

ABTEC's asbestos abatement plan, dated February 17, 1992, for the removal of hazardous roofing materials from the HUD building, states in part, "[t]he work consists of the following items. Removal and disposal of approximately 10,000 square feet of roofing and flashing from the roof of the HUD Building utilizing dust control procedures...." The defendant has contended that Contract Drawing C–1 depicts the total area of the asbestos containing roofing materials as 18,856 square feet and that Beta, and Beta's subcontractors, removed a lesser amount of square footage. In contrast, a chart appears upon a copy of Contract Drawing C–1, submitted by the defendant with its summary judgment motion, that states the amount of asbestos abatement undertaken by Beta and its subcontractors was 19,980 square feet.[4]

Beta and its subcontractors cut the existing roofing assembly with roofing saws and used axes to break the roofing material into pieces for removal and disposal. During the performance of the asbestos abatement, GSA directed Beta and ABTEC to remove all of the roofing material, including the insulation, down to the concrete deck using asbestos abatement procedures. GSA contends that the contract specifications required the removal of roofing materials, including the insulation, using asbestos abatement procedures. Moreover, GSA also contends that the demolition and removal of the asbestos-laden roofing materials contaminated the underlying layers. While Beta did not agree with this interpretation, they proceeded to perform the roofing demolition work using proper asbestos abatement procedures to remove all roofing materials defined in Contract Drawing C–1 as areas along the parapet, equipment curb and expansion joint walls, although under protest.

The parties have stipulated that "[i]nsulation, by itself, is not asbestos containing material." However, GSA argues that the technique used by ABTEC and Beta, when removing the asbestos tainted roofing material, contaminated, or created the threat of contamination to, the underlying insulation. Thus, GSA required that the insulation be removed using the asbestos abatement procedures contained in the contract. In particular, GSA contends that when Beta and ABTEC saw cut or axe cut the roof, into

---

**4.** In the contract drawings turned over at oral argument, and stipulated to by both parties as available to the court for the purpose of deciding the cross-motions for summary judgment, this chart is notably absent. However, this conflict as to the amount of square footage of roofing removed has no impact upon the outcome of this action because it is undisputed that Beta, and its subcontractors, undertook asbestos abatement in excess of 10,000 square feet of roofing.

pieces for removal and disposal, the cut was made through each layer of the roof including the asbestos laden flashing down to the concrete deck, and, thus, intermingled and contaminated the various layers. This intermingling, according to GSA, caused the layers which previously had not been contaminated with asbestos to become contaminated. Ultimately, according to GSA, the threat of contamination necessitated the directive that all roofing materials in the area be considered asbestos tainted, and as defined in the Asbestos Abatement Plan in Contract Drawing C–1, were to be removed using asbestos abatement procedures.

As discussed below, Beta and ABTEC challenged this interpretation, but performed the work as directed by GSA. Beta asserted that GSA's instruction to remove the insulation as asbestos containing material was a change in the terms of the contract. GSA refused to recognize the directive to remove the insulation as a change to the contract.

On April 20, 1992, Sam Hoffman, Beta's Project Manager for the HUD project, sent William Puryear of GSA a letter, which discussed the results of tests performed by Environmental, Inc., which had been hired by ABTEC, to determine whether the insulation located below the built-up roofing was contaminated with asbestos. The test results on the insulation were negative.[5] Consequently, in the letter, Beta asked for a meeting with GSA to discuss requested changes to the contract's performance requirements and pricing. In relevant part, the letter reads as follows:

> Abtec Inc. has requested I write you to see if the requirements for handling of the insulation could be relaxed. Paul Potter of Abtec believes that he can increase his productivity if the insulation can be handled as roofing debris as opposed to hazardous material. We would certainly be glad to meet with interested parties to discuss how this change might effect our present contract amount.

On April 27, 1992, GSA and Beta met to discuss the removal and treatment of the insulation layer. The handwritten minutes of this meeting, prepared by a GSA employee, reflect that William Ivory, a consultant hired by the project's architect to design specifications for the replacement of the HUD roof, stated that the Environmental Protection Agency (EPA) and GSA Environmental Safety guidelines dictate that underlying insulation becomes contaminated when roofing materials above, which contain asbestos, are saw cut into the insulation below. Furthermore, Mr. Ivory noted that the EPA considers everything down to the concrete deck to be asbestos containing material and that "GSA Safety" requires removal of all asbestos containing roofing materials, including insulation, down to the concrete deck.

On May 11, 1992, Beta notified GSA that ABTEC had been terminated. Beta then completed the remaining asbestos abatement itself, without hiring another outside contractor. Significantly, prior to the dialogue between Beta, ABTEC and GSA at the April 27, 1992 meeting, it is evident that Beta's on-site superintendent had already instructed the asbestos abatement subcontractor, ABTEC, that its responsibilities included removal of non-asbestos fiber-board that was attached with roofing asphalt to asbestos-laden materials. In a letter, dated April 2, 1992, ABTEC indicated to Beta, that if ABTEC was required to remove the layers below the flashing as asbestos contaminated, which according to ABTEC was "desire[d]" by Beta, this would increase the cost of performance. Thus, this letter demonstrates that one month prior to the meeting with GSA on April 27, 1992, Beta was performing the contract with the presumption that all roofing materials located in the areas designated in Contract Drawing C–1 for asbestos abatement had to be removed as asbestos contaminated.

By letter dated October 19, 1992, Beta requested additional compensation from GSA for the removal of the insulation as asbestos

---

**5.** The parties are in agreement that insulation, independent of outside contamination, does not contain asbestos. The Environmental, Inc. laboratory results, along with the attached letter and facsimile cover sheet, do not indicate the location

of the sampling, nor do they indicate if the sampling was, in fact, taken from along the saw cuts, activity which, according to GSA, created a threat of asbestos contamination to the insulation layer.

containing material. On October 29, 1992, GSA denied Beta's cost proposal for the removal of the insulation as asbestos containing material. On December 23, 1993, ABTEC submitted a claim to Beta for $59,379.76 to cover the costs associated with the disposal and "removal of non-asbestos material using asbestos abatement procedures."[6] By letter dated March 21, 1994, Beta, for itself, and on behalf of ABTEC, submitted a certified claim in the amount of $101,211.00 representing the allegedly added cost of removing and disposing of the insulation layer as asbestos containing material, as opposed to as non-hazardous construction debris. On May 3, 1994, the contracting officer issued a final decision denying the claim. Subsequently, Beta filed a complaint against the defendant in the United States Court of Federal Claims, requesting judgment in the amount of $101,211.00 plus interest, costs, and attorney's fees.

### *DISCUSSION*

■ The above-captioned case comes before the court on the parties' cross-motions for summary judgment. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure and is similar in language and effect.[7] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); RCFC 56(c).

Rule 56(c) provides that, in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group. Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id. see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd without op.,* 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether the evidence presents a disagreement sufficient to require further fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus.*

---

6. Attached to the joint stipulations is a letter dated March 21, 1994 from Beta to GSA which states that ABTEC submitted a claim to Beta for $60,768.00.

7. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552–53; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

Pursuant to Rule 56, a motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

■ Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.*, 812 F.2d at 1391.

After an examination of the record and the parties' pleadings in the instant case, the court determines that no genuine issues of material fact exist. Therefore, this case is ripe for summary judgment. It is undisputed that Beta was required to use asbestos abatement procedures to remove asbestos contaminated roofing materials. The parties also have stipulated that "[i]nsulation, by itself, is not asbestos containing material." The case turns on whether the contract between GSA and Beta required Beta to use asbestos abatement procedures in removing the insulation and other materials which were attached to, and located below, the asbestos laden roofing material (*i.e.*, vertical

flashing), but which did not, on their own, contain asbestos.

■ Interpretation of a government contract is a matter of law. *See Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965). The language of the contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 388, 351 F.2d at 975. Furthermore, questions of contract interpretation "may be disposed of by summary judgment." *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39 (1989) (citing *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988); *P.J. Maffei Building & Wrecking Corporation v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984)).

When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir.1983). Otherwise stated, to ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979) (citing *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975)).

■ When a disagreement regarding the meaning of the words in a contract is presented to a court, the interpretation of the words included in a contract is a two-step process. The court must determine first whether an ambiguity exists. *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456, *aff'd without op.*, 785 F.2d 325 (Fed.Cir. 1985). If an ambiguity is immediately apparent, it is referred to as a patent ambiguity, and the plaintiff is under a duty to seek clarification. *Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). Although a potential contractor has some responsibility to inquire about a major patent discrepancy, omission or conflicts in the provisions, the contractor is not normally required to seek clarification of "any and all ambiguities, doubts, or possible differences in interpretation." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). If the plaintiff does not inquire about a patent ambiguity, the ambiguity will be construed against the plaintiff. If, however, the ambiguity is not patent, the non-patent ambiguity will be interpreted against the drafter of the contract, so long as the other party's interpretation is a reasonable one. *See Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The alternative interpretation, however, must be within the "zone of reasonableness." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. at 6, 323 F.2d at 877.

Whenever possible, courts look to a "plain language" or "plain meaning" interpretation of contractual documents. *Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed.Cir.1993); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). The ordinary meaning of the language in contractual documents governs, and not a party's subjective but unexpressed intent. *International Transducer Corp. v. United States*, 30 Fed. Cl. 522, 526–27 (1994). "Reasonableness is the standard." *Id.* at 527.

The portions of the contract in dispute in the case at bar are the terms concerning which roofing materials were to be removed using asbestos abatement procedures pursuant to Specification Sections 01010 and 02085R, and the corresponding contract drawings. The contract language at issue, while perhaps ambiguous, was not patently ambiguous. Without dispute, the words of the contract require the removal of all asbestos contaminated roofing materials using asbestos abatement procedures. Moreover, in further support of the theory that the contract, if not clear, perhaps included a latent ambiguity, Beta never challenged or questioned GSA regarding the application of asbestos abatement procedures to the underlying insulation layer during the bidding process or upon receiving the contract. Beta did not question the asbestos abatement requirements until their second subcontractor

on the project, ABTEC, was hired to undertake asbestos abatement, and after work was already initiated by ABTEC.[8] In fact, Beta never questioned the procedures until ABTEC indicated that, from their perspective, the abatement procedures requiring the removal of all materials including insulation—as directed by Beta's on-site superintendent—would increase the performance price of the contract.

The testimony of Paul T. Potter, the president of ABTEC, taken at deposition, selected portions of which were included in the defendant's appendix filed with the court, demonstrates that Beta may even have agreed with the government's understanding of the contract. Beta wanted ABTEC, the asbestos abatement subcontractor, to remove all the insulation as part of the asbestos abatement procedures and originally may have disagreed with ABTEC's more limited view of its asbestos abatement responsibilities under the contract. The following colloquy occurred between defendant's counsel and Mr. Potter:

Q [DEFENDANT'S COUNSEL] During the course of your involvement, in the contract between ABTEC and BETA, who did you deal with in BETA Construction Company?

A The principal was Sam Hoffman.

Q Anyone else?

A I got to meet the superintendent for BETA on the job site, Greg.

Q Is that Gregory King?

A Gregory King, yes.

\* \* \*

A [PAUL POTTER] We got the contract, we started work. We quickly came to find out that there was a misunderstanding between BETA's understanding of the scope of work and our understanding of the scope of work. And we discussed that at length with Sam Hoffman [project manager at Beta] and I assume he discussed it with his higher ups.

Eventually we reduced it to writing saying that we don't think that what your [sic] asking us to do is within our scope of work. We think it's extra and we continued to follow their directions, as we were bound to do and protest it and say that we think that this is beyond our scope of work.

They said, you have to do that.

\* \* \*

The superintendent either requested or directed us to remove additional material.

That was not asbestos containing material and we said, "that's not in our contract, to remove that." But he directed us to remove it and so we had to remove it.

The court, therefore, must examine the reasonableness of an allegedly latent ambiguity and examine Beta's litigation position regarding the language in the contract, specifications and drawings that define its asbestos abatement responsibilities. *See WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. at 6, 323 F.2d at 877. The method employed at the outset by Beta and ABTEC to remove the asbestos contaminated layers of the roof created the threat of contamination, if not actual contamination, to the underlying insulation due to the axe and saw cutting techniques employed to cut through the top layers of the roofing materials and then into the insulation layer. Jesse Bowen, the GSA con-

8. It strikes the court as somewhat curious that it was not until the second asbestos abatement subcontractor, ABTEC, was on the job that questions surrounding the treatment of insulation during the removal process were raised. The very reason that the first subcontractor, Asbestos Mid–Atlantic, was removed from the site stemmed from its non-compliance with asbestos abatement procedures. Thus, not only had there been daily field checks by the defendant and Beta as to proper demolition and removal procedures, but there also had not been any question or challenge to the terms of the abatement procedures under the contract by Beta until after work had been initiated by two asbestos subcontractors. William Ivory, the consultant to the outside architect hired by GSA, testified at a deposition called by the plaintiff that Mid–Atlantic was removed because they "left exposed asbestos on the roof" and "left asbestos bags in elevators. [They] cut roofing and then didn't remove that area, and their personnel and equipment were ill-trained." There is no doubt that the removal of the first abatement contractor put Beta on further notice of GSA's heightened concerns regarding asbestos contamination and proper removal procedures.

tracting officer, described the contamination risk caused by ABTEC's removal methodology in his letter of May 3, 1994 to Beta denying their claim for additional removal costs in stating:

This claim is for the additional cost of the removal for the roofing insulation that became tainted by reason of the method you elected to remove it. This insulation is in an area designated "area of asbestos containing material to be removed".

This area contained an upper ply of asbestos bearing material and a lower ply of asbestos free material. It was your opinion that the lower ply could be removed and disposed of without regard to asbestos abatement procedures.

Unfortunately, the method you decided to employ to remove the upper ply used a saw cut technique. In removing the upper ply, the saw cut into the lower ply and as a result tainted the material that was in the lower ply.

It is likewise apparent to the court that preventing contamination, and thus the threat or risk of contamination, however remote, was of paramount concern in the asbestos abatement procedures, as crafted in the contract specifications by GSA. Under Specification Section 02085R, paragraph 3.1, the contract calls for isolation of the roof work area by "completely sealing off all building openings at the designated work area," installing a "decontamination facility," cleaning and removing "all specified removable items" prior to work, covering "all remaining nonremovable items and equipment ... with plastic sheeting taped securely in place," and posting warning signs and labels. It is not reasonable for Beta and ABTEC to suggest that the contract intended for materials, which were attached to asbestos tainted material by asphalt, and exposed to asbestos contamination in the demolition process, to be disposed of as non-hazardous construction debris. Beta was on notice by the language, terms and drawings of the contract regarding the dangers associated with asbestos, and by the distinct known threat of contamination during demolition, that these abatement procedures were designed to prevent further asbestos contamination. According to the intent and language of the contract, the fact that the roof removal process used by Beta could contaminate the insulation is consistent with the contract's requirement that all roofing materials in areas designated under the Asbestos Abatement Plan be removed using asbestos abatement procedures.

Moreover, the fact that the insulation was tested and found to be asbestos-free does not change the contract requirements because it is not only contamination, but also the danger of contamination, that triggered the asbestos abatement procedures established in the contract between the parties. In addition, there is no evidence that the sample tested by Environmental, Inc. was taken adjacent to a saw cut penetrating through an asbestos-laden layer. The laboratory report submitted to the parties to demonstrate the absence of asbestos in the insulation is based upon, at best, a single or isolated sample of insulation. Multiple samples of insulation for testing purposes were not undertaken by ABTEC. Moreover, Beta did not itself order or test any samples of insulation. A general reading of the contract's sampling requirements, in Specification Section 02085R, paragraph 3.4(A), albeit applicable to air sampling, indicates that multiple daily sampling and monitoring of asbestos content was required to verify that the contractor was maintaining non-hazardous field quality controls.

Beta, an experienced roofing contractor, should have reasonably known that a danger of contamination would arise from the technique ABTEC employed to remove both the contaminated and uncontaminated roofing materials. Paragraph 3.2(B) of Specification Section 02085R describes the gravity of potential asbestos contamination, in mandating the construction of a decontamination system consisting of "three chambers," including a clean room, an equipment room, and shower room to which "careful attentin [sic] shall be paid to shower enclosure to ensure against leaks of any kind." All water waste from the shower room was to be treated as asbestos waste. The hazards of asbestos contamination also are identified in paragraph 3.5(B) of Specification Section 02085R which includes the following warnings:

Maintain all surfaces on the roof area free of accumulations of asbestos fibers to prevent further dispersion. Give meticulous attention to restricting the spread of dust and debris, keep waste from being distributed over the general area or to lower floors. Use approved industrial vacuum cleaners with a HEPA filter to collect dust and small scrap. The blowing down of the work area with compressed air is forbidden. Post appropriate asbestos hazard warning signs.

It reasonably follows that if asbestos abatement workers ran the risk of asbestos contamination while laboring to demolish and remove the asbestos containing materials, then the roofing insulation, which was exposed by saw cutting through these same tainted materials, would run a similar risk of contamination.

■ Beta argues that the contract could reasonably be interpreted as not requiring Beta to remove the insulation using asbestos abatement procedures, and cite to *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988) ("the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable") (citations omitted). Beta's interpretation, however, is not within the "zone of reasonableness." *WPC Enterprises, Inc. v. United States*, 163 Ct. Cl. at 6, 323 F.2d at 877. The plaintiff argues that because the insulation was not contaminated with asbestos at the time that the parties entered into the contract, and at the time they started work, they were not required to use asbestos abatement procedures in removing the insulation.[9] This argument fails to account for the danger that the insulation would become contaminated during the removal of the asbestos containing roofing materials. There is no doubt that under the terms and specifications of the contract all materials which were contaminated by asbestos, or those which were significantly threatened to be contaminated by asbestos, were to be removed using the abatement procedures, regardless of the time when these materials became contaminated with any asbestos. Cutting through the layers of built-up roofing and attached flashing, which contained asbestos, obviously created dust which could fall onto and intermingle with the insulation below. This dust, according to the contract specifications, was to be removed using asbestos abatement procedures. Thus, it was reasonable for the government to require, in accordance with the contract, that insulation which became tainted with asbestos contaminated dust also had to be removed using asbestos abatement procedures.[10]

In addition, Beta argues that because the roofing insulation was not enumerated in the contract specifications as asbestos containing, this omission of the term insulation is evidence that there was no intent in the contract to include insulation in the asbestos abatement work. *See Monroe M. Tapper & Associates v. United States*, 221 Ct.Cl. 27, 36,

9. The plaintiff claims that it was never instructed by GSA to use asbestos abatement procedures on all of the roofing materials in the areas defined in the "Asbestos Abatement Plan," other than those which contained asbestos prior to beginning work on the project. In contrast to this allegation, William Ivory, the consultant to the project's architect, testified in a deposition taken by the plaintiff that Beta met with GSA before starting the roof removal and outlined the contractor's asbestos abatement procedures which, at that time, were in conformance with GSA's specifications. Prior to beginning its work on the roof removal, ABTEC also met with GSA and, according to Ivory, was told that everything down to the concrete deck had to be removed as asbestos containing material. While the occurrence of this conversation might be viewed as a fact in dispute, it is not material because the methodology of demolition by ABTEC and Beta created the risk of contamination and, as dis-

cussed below, an integrated reading of the terms, language and references to and including the drawings in the contract, demanded removal of all materials as delineated in the Asbestos Abatement Plan.

10. While plaintiff's counsel at oral argument vociferously argued that the dust created by cutting through the asbestos containing layer could be controlled by using a saw cutter with a HEPA vacuum attachment, the facts presented to this court do not show this to be the case. In fact, the consultant to the project's architect, William Ivory, stated in a deposition taken by the plaintiff that Beta and ABTEC did not use a saw cutter with a HEPA vacuum attachment because they did not have one on the job site. Mr. Ivory further testified that Beta's job site superintendent, Greg King, tried unsuccessfully to hook a ventilation system to an existing cutter.

602 F.2d 311, 316 (1979) (finding that specifically listing several subjects without including general words illustrating other subjects not named, reasonably indicated subjects not named were to be excluded). Plaintiff also cites to an Armed Services Board of Contract Appeals decision for the proposition that GSA should have "added a catch-all paragraph to the items mentioned ... which would have cautioned that the itemization was not exclusive or complete" because "[t]he use of such broad language would undoubtedly have raised the bid price substantially, as respondent must have recognized." *Jacksonville Shipyards, Inc.,* ASBCA 12361, 67–2 BCA 6694 (1967). These arguments fail because the defendant, in fact, used broad, "catch-all" language in its Specification Sections to indicate the overview of the contract, and then delineated in the contract drawings the roofing areas and materials to be demolished and removed under the Asbestos Abatement Plan.

Turning to the specifications and details in the contract, Note 1 of Contract Drawing C–1 identifies the roofing areas to be removed utilizing asbestos abatement procedures. The plain language in the note states that both "ROOFING" and "(VERT) FLASHING" are to be removed from the shaded areas under this Asbestos Abatement Plan. Significantly, only "(VERT) FLASHING" actually contained asbestos in hazardous amounts (absent any intermingling and contamination of materials during demolition). The word "ROOFING," in turn, is a catch-all term for built-up roofing, which is composed of tar and paper, asphalt roofing cement, fiber-board, and rigid insulation, as noted and drawn in Contract Drawing 3–1. It is noteworthy that none of these items contained consequential amounts of asbestos prior to contamination during demolition and removal. Nevertheless, Note 1 on Contract Drawing C–1, part of the Asbestos Abatement Plan, directs the contractor to "REMOVE ASBESTOS CONTAINING ROOFING & (VERT) FLASHING 3'–0" FROM VERT FACE ... & AS SHOWN IN SHADED AREAS."

Contrary to plaintiff's interpretation, the term "ASBESTOS CONTAINING" does not simply modify "FLASHING," an asbestos-laden material, but instead modifies both "FLASHING" and "ROOFING." The modifier thus indicates that all of the roofing materials in the shaded areas, as listed on the demolition drawings, and specifically including the flashing, is to be removed as part of the Asbestos Abatement Plan.[11] Thus, the specifications, in combining a general term (roofing) and a specific item already contaminated with asbestos (the flashing), identified both the general grouping and one specific item as "ASBESTOS CONTAINING." Moreover, GSA used specific terms in Note 2 on Contract Drawing C–1, and explicitly listed every item to be removed because these items were located outside of the shaded areas identified in Note 1. "ALL PENETRATION FLASHING" follows the specific list merely to categorize those items. In contrast, Note 1 on Contract Drawing C–1 does not intend to list every item in the catch-all "ROOFING" group, but instead defers to the demolition drawings where the items that encompass "ROOFING" are identified.

In sum, although Beta argues that the identification of asbestos containing material to be removed in the notes on Contract Drawing C–1 (*e.g.,* the flashings, pitch pockets, vents, roof drains, and roof vents) indicates that the government intended to exclude all other materials from removal by the asbestos abatement procedures, this is contrary to the fact that the Asbestos Abatement Plan carefully delineates the roof area to be removed under the plan on Contract Drawing C–1 in Note 1 in addition to the listed penetration flashing in Note 2. The government simply illustrated specific items outside of the shaded roofing areas that required removal, and did not limit items in the shaded area, thereby requiring that asbestos abatement procedures be employed for all roofing materials.

The government's interpretation is further supported by other statements found in Con-

11. Contract Drawing C–1 likewise has a key symbol that represents the shaded areas in the drawing which is defined as "AREA OF ASBESTOS CONTAINING MATERIAL TO BE REMOVED." Notably, there is no limitation as to depth, or itemization of specific materials, to be removed.

tract Drawing C–1, Asbestos Abatement Plan. The Asbestos Abatement Plan directly refers the contractor to Contract Drawings 3–1, 3–2 and 3–3. There is no doubt that the demolition details in Contract Drawings 3–1 through 3–3 are an integral component of the Asbestos Abatement Plan. The documents clearly direct the contractor to "REMOVE RIGID INSULATION," thus, ordering that insulation, as well as the other materials enumerated, were to be removed using asbestos abatement procedures. *See Thanet Corp. v. United States,* 219 Ct.Cl. at 82, 591 F.2d at 633 (finding that a contract is to be construed in its entirety "so as to harmonize and give meaning to all its provisions"). This combination of drawings and the references in these drawings demonstrates that GSA articulated that the contractor, Beta, was to demolish and remove all roofing materials in the shaded areas, including the insulation and the flashing, using the same asbestos abatement procedure.

## CONCLUSION

The mere presence of ambiguity in the language of the GSA roofing removal contract with Beta does not render the plaintiff's interpretation a reasonable one. As discussed above, plaintiff's interpretation is not supported by the terms and conditions explicitly stated in the contract. Moreover, Beta should have recognized that the asbestos protection requirements included in the contract were designed to prevent the risk and threat of asbestos contamination. Therefore, the court finds that the contract language required Beta and its subcontractors to remove the asbestos containing roofing materials, using asbestos abatement procedures in the areas identified in the contract drawings under the terms of the contract. The plaintiff's motion for partial summary judgment, therefore, is **DENIED**, and the defendant's cross-motion for summary judgment, hereby, is **GRANTED**.

**IT IS SO ORDERED.**